Joseph E. O'NEILL, et al.,
Plaintiffs–Appellants,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, et al.,
Defendants–Appellees.

No. 88–2848.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1989.

---

Marty Harper, Allen R. Clarke, Lewis & Roca, Phoenix, Ariz., William E. Schweinle, Jr., Reginald H. Wood, Stubberman, McRae, Sealy, Laughlin & Browder, Houston, Tex., for plaintiffs-appellants.

Harold G. Levison, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, John A. Irvine, Thelen, Marrin, Johnson & Bridges, Houston, Tex., for defendants-appellees.

Before POLITZ, DAVIS and DUHE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Joseph O'Neill, et al., (the O'Neill Group or the pilots) appeal from the district court's grant of summary judgment dismissing their action against the Air Line Pilots Association (ALPA). We vacate the district court's dismissal of the pilots' unfair representation claim, and remand the case to the district court for further proceedings on this count. We affirm the district court's dismissal of the pilots' claim for relief under section 101(a)(1) of the Labor–Management Reporting and Disclosure Act (LMRDA).

I.

This dispute arises out of the settlement of a two-year strike by ALPA against Continental Air Lines (CAL). The O'Neill Group were ALPA members employed as pilots by CAL, and participated in the strike against the airline.

ALPA has been the authorized and exclusive bargaining representative for the airline pilots employed by Continental Air Lines and its corporate predecessors since the 1940s. CAL and ALPA adopted their most recent collective bargaining agreement in 1982. In 1983, CAL waged a campaign to win substantial financial concessions from its employee groups, including CAL pilots. CAL and the pilots' union ultimately failed to reach a concession agreement and in September 1983, CAL filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, et seq. CAL then repudiated its existing collective bargaining agreements with ALPA and its other unions, and unilaterally implemented its previously requested concessions as "emergency work rules," including cuts of more than fifty percent in pilots' salaries and benefits.

In October 1983, ALPA initiated a lawful pilot strike in response to CAL's rejection of its labor contract, and filed suit under the Railway Labor Act, 45 U.S.C. § 151, et seq. (RLA), to enforce the collective bargaining provisions. The strike lasted for more than two years, during which time CAL continued to operate by employing cross-overs and hiring large numbers of permanent replacement pilots. The number of working pilots grew; by August 1985, working pilots at CAL exceeded the number of strikers 1,600 to 1,000.

In June 1984, after extended litigation, the bankruptcy court approved CAL's rejection of the ALPA–CAL collective bargaining agreement, and ordered ALPA and CAL to engage in collective bargaining over the formation of a new labor contract. CAL and ALPA met on and off until late August 1985, when CAL notified ALPA that it was withdrawing recognition of ALPA as the authorized collective bargaining representative of the CAL pilots. ALPA filed suit in the Southern District of Texas in September 1985, challenging CAL's unilateral withdrawal of recognition and its refusal to engage in further negotiations.

As part of its continuing process of filling pilot vacancies, on September 9, 1985, CAL posted "Supplementary Base Vacancy Bid 1985–5." CAL historically provided for future pilot training and staffing needs through its "System Bid" process. Under CAL's System Bid procedure, any pilot interested in a posted vacancy could submit a bid specifying the pilot's preferred positions based on status (i.e., Captain, First Officer, Second Officer), base (city), and equipment type. Once pilots submitted their bids to CAL, vacant positions were allocated solely according to seniority, determined by the date a pilot first flew for Continental. Promotions to vacancies on new or different equipment from which a pilot had been trained required additional training of pilots before the vacancies were actually filled. CAL's bids were posted

well in advance of these vacancies in order to schedule this training while maintaining current service. The 85–5 bid announced vacancies to be filled in 1986 for 441 future Captain and First Officer positions and an undetermined number of Second Officer vacancies. All participating pilots were required to submit their bids by September 18, 1985.

Apparently concerned by the number of future vacancies to be awarded under the 85–5 bid, ALPA's Master Executive Council for the CAL pilots (CAL MEC or the MEC),[1] authorized striking pilots to submit bids while also continuing the strike effort. Confusion over the bids tendered by several hundred strikers and questions concerning the legitimacy of their offers to return to work led CAL to challenge the strikers' bids. In late September 1985, the CAL MEC voted to continue the strike.

During October 1985, CAL and a pilots' committee, drawn from ALPA leadership and the CAL MEC, conducted negotiations under the supervision of the bankruptcy court that resulted in an October 31, 1985 consent agreement termed the "Order and Award." This order and award entered by the bankruptcy court established terms for settling both the ALPA strike and the outstanding litigation between the parties. ALPA consented to entry of the order and award without notice to or ratification by the CAL pilots or the CAL MEC.

The October 31, 1985 order and award altered CAL's standard bidding system for the 85–5 bid and the recall of striking pilots. The agreement established three options for strikers. Striking pilots who wished to return to work were required to choose either option 1 or option 3. Option 1 required strikers to waive all claims against CAL (including claims in bankruptcy for unpaid wages, and damages against CAL for abrogation of the collective bargaining agreement). In return CAL agreed to call them back to work according to "modified" seniority provisions. The rel-

evant "transitional" modifications to seniority order and bid procedures included: (1) current working pilots (nonstrikers) were awarded the first 100 Captain positions in the 85–5 bid. These working pilots were generally ineligible for these positions under an integrated seniority list that included strikers and nonstrikers and standard bidding procedures; (2) the next seventy Captain positions were to be awarded to the seventy most senior returning strikers who waived their claims against CAL, all of whom had been Captains before the strike. In filling these seventy vacancies, CAL had the right to assign these returning strikers to the base and equipment of CAL's choice. Additionally, these returning strikers were required to fly as First Officers for four months before assuming the Captain vacancies; (3) thereafter returning strikers would assume Captain positions on a 1:1 ratio with working pilots, essentially "dovetailing" a striker seniority list with a seniority list for replacement pilots.

The working pilots, following usual bid procedures, were awarded particular vacancies under the 85–5 bid on seniority according to their registered preferences for rank, base and equipment; although CAL recalled former strikers by seniority among strikers, CAL assigned each returning striker to CAL's choice of rank, base or equipment regardless of the pilots' preferences. These provisions had the effect of advancing many nonstriking pilots over more senior striking pilots, and awarding to nonstrikers the majority of the 85–5 Captain vacancies, the most desirable positions. Returning strikers, although recalled in seniority order, were required to accept the position offered by CAL, which could be a rank well below what the pilot was entitled to under seniority bidding procedures. Where a former striker upon recall was assigned initially to a First or Second Officer position, CAL had the right to assign the pilot to the base and equipment of his first Captain position as well.[2]

---

1. The CAL MEC is a committee made up of pilot representatives elected by ALPA rank-and-file. The CAL MEC serves as the ALPA coordinating council for CAL pilots, although its authority is subject to the decisions of the ALPA executive board and board of directors.

The Agreement provided for filling Captain vacancies on a 1:1 ratio between strikers and nonstrikers until at least October 1, 1988. The practical effect of these "transitional" provisions was foreseeably much longer. For example, equipment freezes restricted the ability of pilots to change types of aircraft for varying periods of time after being trained on them (typically two years).

Option 3 permitted pilots to keep their claims against CAL, but provided that they could not return to work nor become Captains until after the Option 1 pilots. Option 3 pilots were to be recalled in the order in which they tendered their unconditional offers to return to work rather than in seniority order. CAL retained the same right to assign the Option 3 pilots to vacancies as described above for Option 1 pilots.

Option 2 covered strikers who elected not to return to work for CAL. CAL agreed to pay these pilots severance pay of $4,000 for each year of service, up to a total dollar amount of $2.6 million. In return the strikers relinquished their right to recall, and released all other claims against CAL.

## II.

The O'Neill Group is a certified class comprised of approximately 1,400 past and present CAL pilots who went on strike on October 1, 1983 and remained on strike through October 31, 1985, the date the strike ended. The O'Neill Group brought suit against ALPA, the CAL MEC, and certain individual negotiators in April 1986 for their roles in the strike settlement. In its complaint as amended, the O'Neill Group sought recovery on four counts. Count 1 alleged a breach of the duty of fair representation which ALPA and various ALPA officers owed plaintiffs under the RLA. Count 2 alleged a violation of the voting rights of the plaintiffs, guaranteed

under section 101(a)(1) of the LMRDA, 29 U.S.C. § 411. The O'Neill Group also asserted two additional claims not relevant to this appeal.

In August 1987, ALPA moved for judgment on the pleadings and for summary judgment on all counts. The O'Neill Group's response to ALPA's motion for summary judgment was a 150–page memorandum of law and five volumes of affidavits and other exhibits. The O'Neill Group asserted that the duty of fair representation had been breached by ALPA and various ALPA officers because (1) ALPA failed to allow ratification of the agreement and misrepresented the facts surrounding the negotiations to avoid a ratification vote; (2) ALPA negotiated an agreement that arbitrarily discriminated against striking pilots, including the O'Neill Group; (3) ALPA and various ALPA officers misrepresented to retired and resigned pilots that they would be included in any settlement; and (4) defendants were compelled by motives of personal gain, namely self-interest and political motivations. Concerning the LMRDA section 101 claim, the pilots asserted that they were entitled to vote on ratification of the agreement and order, and that liability under LMRDA is assessed against a union that violates the voting rights of all of its members as a matter of law.

Following oral argument in November 1987, the trial court ruled from the bench, granting ALPA's summary judgment motion and dismissing the pilots' suit. The transcript of the court's general bench remarks following argument provides the only explanation for its ruling.

Rather than finding the settlement "beneficial" as ALPA claimed, the trial court remarked: "that the deal is somewhat less than not particularly satisfactory is not relevant to the issue of fair representation," adding that "the agreement that was

---

**2.** To illustrate the effect of these transitional provisions, the O'Neill Group estimated in December 1987 that the most senior returning striker not yet flying as Captain had 23 years of seniority, held seniority number 65 on the integrated seniority list and flew as a Captain before the strike. The most senior working pilot not yet flying as a Captain had four years of seniori-

ty at CAL and held seniority number 1442. In addition, the nonstriker bid for his Captain vacancy, whereas the former striker could be assigned his base and equipment by CAL. (Instr. 163, att. 13). Under the 1:1 ratio prescribed by the Order and Award, these were the next two pilots to be promoted to Captain.

achieved looks atrocious in retrospect, but it is not a breach of fiduciary duty badly to settle the strike." The court apparently concluded that the pilots had no legal rights against ALPA because the settlement was issued as a court order, and alternatively because the agreement did not single out particular members for discriminatory treatment. "There is nothing to indicate that the union made any choices among the union members or the strikers who were not union members other than on the best deal the union thought it could construct." With respect to the pilots' claim that ALPA denied their voting rights, the district court concluded that: "in Count 2, the equality within the craft under the cases apparently precludes that claim."

The O'Neill Group appeals the dismissal of Count 1 (duty of fair representation) and Count 2 (LMRDA section 101 ratification rights) of their complaint.

### III.

Our task in this case is to review the district court's determinations that no genuine issue of material fact is presented and summary judgment is proper as a matter of law. This undertaking in a complex case with a summary judgment record in excess of 6,000 pages is particularly difficult because the district court's cursory bench remarks provide little help to us in analyzing the issues. As this court reiterated recently, "Although nothing in Fed. R.Civ.P. 56, governing summary judgment, technically requires a statement of reasons by a trial judge for granting a motion for summary judgment, we have many times emphasized the importance of a detailed discussion by the trial judge." *McIncrow v. Harris County*, 878 F.2d 835, 835 (5th Cir.1989), *quoting, Heller v. Namer*, 666 F.2d 905, 911 (5th Cir.1982) (footnote omitted). "In all but the simplest case, such a statement usually proves not only helpful, but essential." *Jot–Em–Down Store (JEDS) Inc. v. Cotter & Co.*, 651 F.2d 245, 247 (5th Cir.1981). "When given such aid, counsel know what issues must be met and the appellate court need not scour the entire record while it ponders the possible explanations." *Id.*

■ To survive summary judgment, the O'Neill pilots are required to present summary judgment evidence tending to show a genuine issue of material fact. In several recent decisions, the Supreme Court has clarified what is required of the plaintiffs by this standard. "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. Plaintiffs' evidence is to be believed, however, and all justifiable inferences are to be drawn in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In reviewing the district court's ruling on a motion for summary judgment, we apply the same standard that governs the district court. *Bache v. American Tel. & Tel.*, 840 F.2d 283 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988).

### A. Fair Representation Claims

The duty of fair representation owed by a union to its members has been implied by the courts from national labor statutes. The Supreme Court has stated that the duty of fair representation imposes on the exclusive bargaining representative "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). More succinctly, "A breach of the statutory duty of fair repre-

sentation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916.

ALPA would have us adopt a standard which requires intentional or deliberate misconduct by the union in order to find a breach of the duty of fair representation. We consistently have held, however, that the Supreme Court's definition of the duty of fair representation enunciated in *Vaca v. Sipes* "recognizes three distinct standards of conduct." *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 957 n. 6 (5th Cir.1976). *See Hammons v. Adams*, 783 F.2d 597, 601 (5th Cir.1986) ("[The union's] conduct, however, must not be 'arbitrary, discriminatory, or in bad faith;' a standard that has since been repeated by the Court with only minor rephrasing.") (citations omitted); *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467 (5th Cir.1981); *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332 (5th Cir. 1980); *Sanderson v. Ford Motor Co.*, 483 F.2d 102, 110 (5th Cir.1973). *See also Griffin v. Int'l Union, United Automobile A & AIW*, 469 F.2d 181, 183 (4th Cir.1972) ("A union must conform its behavior to each of these three separate standards.... Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.").

■ A breach of the duty of fair representation does not require that a union's conduct be taken in bad faith or with hostile discrimination, but may rest upon the arbitrariness or irrationality of the union's acts. *See Bache v. AT & T*, 840 F.2d at 291. Addressing "the arbitrariness standard" this circuit has stated in *Tedford:*

We think a decision to be non-arbitrary must be (1) based upon relevant, permissible union factors which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) *a rational result of the consideration of these factors;* and (3) inclusive of a fair and impartial consideration of the interests of all employees.

*Tedford*, 533 F.2d at 957 (footnotes omitted) (emphasis added).

■ A breach of the duty of fair representation requires more than a showing of negligence or "honest, mistaken conduct." *Amalgamated Ass'n of Street, etc. v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). *Accord Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976); *Coe v. United Rubber Workers*, 571 F.2d 1349, 1350 (5th Cir.1978) (per curiam) ("carelessness or inadvertence neither constitutes nor is evidence of" a breach of fair representation duty). Particularly in the bargaining context, a union's responsibilities permit the exercise of judgment within a wide range of reasonableness, "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Hammons v. Adams*, 783 F.2d at 601, *quoting, Hines* 424 U.S. at 564, 96 S.Ct. at 1056. In order to prove a breach of the union's duty to the membership, it is insufficient to show merely "that the union improperly balanced the rights and obligations of the various groups it represents." *Freeman v. Grand Int'l Bro. of Locomotive Engineers*, 375 F.Supp. 81, 93 (S.D.Ga.), *aff'd*, 493 F.2d 628 (5th Cir.1974).

■ ALPA argues that the bankruptcy court's approval of the order and award gives rise to a presumption that the settlement is fair, adequate and reasonable. We disagree; all the terms of the settlement the pilots complain of in this litigation had been resolved by ALPA and CAL before the proposed order was submitted to the bankruptcy court. The order and award therefore constituted in essence a consent decree, embodying "primarily the results of negotiation rather than adjudication." *United States v. City of Miami*, 664 F.2d 435, 440 (5th Cir.1981). We agree with the pilots that the bankruptcy court's approval of the settlement does not insulate ALPA's conduct from scrutiny, nor bar the pilots' claims. *See Ibarra v. Texas Employment Com'n*, 823 F.2d 873 (5th Cir.1987).

■ We now turn to the pilots' specific arguments of how ALPA breached the duty of fair representation. The pilots' most fundamental complaint is that ALPA's strike settlement was irrational and arbitrary because of the gross disadvantages the pilots suffered under the settlement that they would not have suffered if they had simply surrendered to CAL's demands and returned to work. We are persuaded that a jury would be entitled to infer that ALPA was arbitrary in accepting the strike settlement if it finds that the union should have expected much more favorable treatment for the pilots had the pilots simply given up the strike effort and offered to return to work. In other words, a jury might reasonably find the union's conduct irrational or arbitrary if the union inexplicably agreed to a settlement that left its members in a substantially worse position than if no settlement had been made. We conclude that a jury could find that the order and award left the striking pilots worse off in a number of respects than complete surrender to CAL.

ALPA contends that the strike settlement provided for CAL to reemploy strikers who would not have otherwise been entitled to return to work at CAL. We disagree. The striking CAL pilots who had not obtained substantially similar jobs (as pilots) continued to be employees of CAL. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967). Because this strike was an economic one, CAL was entitled to hire permanent replacement workers to continue business operations. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). Had the strike terminated without the settlement, CAL was not required to discharge these replacement workers in order to rehire the former strikers. But absent exceptional circumstances discussed below, the returning strikers, as CAL employees, were entitled to reinstatement as vacancies occurred. *Id.*

ALPA asserts several possible justifications which CAL potentially could have offered to avoid rehiring the returning strikers. These justifications include "legitimate and substantial business reasons," and striker "misconduct." *See OCAW v. American Petrofina Co.*, 820 F.2d 747, 750 (5th Cir.1987). But the summary judgment evidence provides no clear basis for this concern. Furthermore ALPA's outside legal counsel advised the ALPA leadership in September 1985 that CAL had not practiced dilatory tactics in reinstating individual strikers who offered to return to work, and consequently he felt such tactics were unlikely should ALPA submit an offer to return on behalf of all strikers. Thus a factfinder could infer that ALPA knew that CAL would not have refused to rehire strikers if ALPA had tendered an unconditional offer for the pilots to return to work.

The most fundamental rights the strikers lost in the order and award were their rights that flowed from seniority. ALPA argues that the pilots had absolutely no assurance that CAL would have recognized any of their seniority rights if they had unconditionally offered to return to work. Thus, ALPA contends that the limited seniority secured by the settlement was beneficial to the pilots. The pilots submitted strong summary judgment evidence however that CAL intended to reinstate strikers with ordinary seniority rights and privileges after the strike ended.[3] ALPA was

3. For example, CAL's standard bidding procedures, awarding vacancies to the bidders with highest seniority, were in effect before and during the strike, and were not altered for replacement pilots or for individual strikers who had chosen to return to work. (Instr. 163, atts. 8, 9; Instr. 149, exh. 101). CAL stated in a claim filed September 25, 1985 in the Southern District of Texas (hoping to void all 85–5 bids from strikers) that it honored pre-strike seniority of all pilots returning from the strike; that all striking pilots continued to accrue seniority during the strike; and that many strikers were eligible to win their bids for Captain positions under the 85–5 bid because of their seniority levels. (Instr. 163, att. 9, ¶¶ 10, 32). The record further includes evidence that ALPA discussed the subject with CAL during the September 1985 MEC meetings, and CAL indicated that it would honor an unconditional return and recall strikers in seniority order according to their bids. (Instr. 163, att. 5.5 at 166–69). CAL had returned striking flight attendants and machinists to work in seniority order, with all the benefits and privileges of seniority, after both unions

advised by its legal counsel in September 1985 that CAL would be obligated to recall strikers in seniority order if they were still employees of the company. Accepting the pilots' evidence as true as we are required to do, a jury could reasonably conclude that if ALPA had unconditionally offered to return the pilots to duty, CAL likely would have returned striking pilots to work according to seniority, and would have permitted strikers to bid for vacancies according to CAL's seniority-based assignment procedures.

Furthermore, if the pilots had unconditionally agreed to return to work, CAL could not have changed its policy of assigning work by seniority, thereby adversely affecting returning strikers, unless it had a legitimate and substantial business justification for doing so. See NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967); NLRB v. Erie Resistor Corp., 373 U.S. 221, 231, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308 (1963); George Banta Co. v. NLRB, 686 F.2d 10, 19 (D.C.Cir.1982); Lone Star Industries, Inc., 279 N.L.R.B. 550, 122 L.R.R.M. 1162 (1986). Yet the order and award allowed CAL to disregard the seniority of returning strikers in awarding jobs and to assign less senior nonstriking pilots to vacant positions. If a jury accepts the pilots' evidence that CAL likely would have recognized the returning strikers' seniority rights and privileges if they had unconditionally agreed to return to work it could further infer that ALPA was arbitrary in accepting the unfavorable settlement.

We reject ALPA's argument that the 85–5 bid positions were not vacancies at the time the order and award issued because they had been assigned to working pilots by that date. In August 1985, ALPA prevailed on this issue in another suit: a federal district court held that bid positions were not filled until pilots were trained and serving in these positions. ALPA v. United Air Lines, Inc., 614 F.Supp. 1020 (N.D.Ill. 1985), aff'd in relevant part, 802 F.2d 886 (7th Cir.1986), cert. denied, 480 U.S. 946,

107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). See also Indep. Federation of Flight Attendants v. Trans World Airlines, Inc., 819 F.2d 839 (8th Cir.1987). ALPA, in the face of this favorable ruling in an analogous case involving striking United Airlines pilots, approved the terms of the order and award, generally permitting replacement pilots to keep the 85–5 bid vacancies awarded them, except in isolated instances where the transition provisions of the settlement otherwise provided.

In sum, the returning strikers were generally senior to the working pilots and under ordinary seniority rules entitled to fill the vacancies announced in the 85–5 bid. Yet the terms of the order and award gave the nonstriking, working pilots most of these positions. Also returning strikers who wanted to return to work were required to waive any claims for damages they had against CAL. A factfinder could infer that had ALPA unconditionally offered to return the pilots to work, the strikers would have been recalled in seniority order, and would have been able to successfully bid for these vacancies and also preserve their litigation rights against CAL.

The pilots also contend that ALPA breached its duty of fair representation by negotiating a settlement which impermissibly discriminated against strikers. The pilots argue that the order and award impermissibly preserved strikers and nonstrikers as two distinct groups after recall so CAL could reward the nonstrikers and punish the strikers. ALPA argues it must be given broad negotiating discretion and that agreeing to an arrangement which divides CAL pilots into strikers and nonstrikers for a transitional period is not per se illegal or a breach of its duty to the pilots. The Supreme Court has stated that a wide range of reasonableness must be allowed a bargaining representative in serving the unit it represents, but a union's broad authority in negotiating and administering effective agreements is not without limits. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554.

tendered unconditional offers to return to work

in April 1985. (Instr. 163 att. 6).

The Supreme Court has expressed special concern for post-strike working conditions which "create[] a cleavage ... continuing long after the strike is ended. Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained extra seniority. This breach ... stands as an ever-present reminder of the dangers connected with striking and with union activities in general." *NLRB v. Erie Resistor Corp.*, 373 U.S. at 230. "These are the types of employer action that have been held inherently destructive of employee rights." *NLRB v. American Olean Tile, Co.*, 826 F.2d 1496, 1500 (6th Cir.1987). The pilots have raised a genuine issue of material fact as to whether the adverse, discriminatory post-strike treatment of strikers under the strike settlement can be justified. Depending upon the explanation offered by ALPA, a factfinder might infer that the negotiated division of pilots into strikers and nonstrikers and the subsequent unfavorable discriminatory treatment of returning strikers constituted a breach of the union's duty of fair representation.

### B. Ratification Rights

■■■ The O'Neill Group asserts in its second count that the union violated section 101(a)(1) of LMRDA by denying the right of rank-and-file members to ratify the settlement agreement.

Section 101(a)(1) of LMRDA states:

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1). Section 101(a)(1) does not grant voting rights where none are conferred by a union's constitution or bylaws; rather it serves to protect the fair exercise of any rights that are provided by the union's constitution and bylaws.

The law does not require that a collective bargaining agreement be submitted to a local union or the union membership for authorization, negotiation or ratification, in the absence of an express requirement in the agreement, or in the constitution, by-laws or rules and regulations of the union. The statute [LMRDA § 101(a)(1)] does not require submission of proposed agreements or any segments thereof to the membership; nor grant members the right to vote on negotiating, executing and approving contracts.

*Confederated Independent Unions v. Rockwell–Standard Co.*, 465 F.2d 1137, 1140 (3d Cir.1972) (citations omitted). Thus, our first inquiry is to examine whether voting rights were conferred upon the rank-and-file by the ALPA constitution or bylaws.

■■■ The ALPA constitution as amended in 1982 provided in relevant part:

Sec. 2. The conclusion of an agreement shall, at the discretion of the individual Master Executive Council, be subject to ratification.

Both parties agree that the above constitutional provision required ratification by the membership if, but only if, the MEC subjected an agreement to ratification. Thus we must decide whether the CAL MEC had determined that the proposed settlement of the CAL pilots strike required ratification before the order and award was submitted to the bankruptcy court.

The pilots contend that the CAL MEC passed a resolution in September 1983 requiring pilot ratification of any agreement giving concessions to CAL. They rely upon this resolution for the right of the membership to ratify the strike settlement of October 31, 1985. The relevant portion of this states: "BE IT FURTHER RESOLVED that the final pilot cost reduction plan will be subject to membership ratification prior to final approval and implementation."

This resolution was passed by the CAL MEC during a meeting in which the MEC was debating whether to participate in a $150 million cost reduction plan for all CAL employees. CAL had been in financial

trouble for some time, and in September 1983 had submitted specific cost reduction proposals to its employee groups. A $60 million package of pay, benefits and productivity concessions was submitted to the CAL pilots, embodied in a document known as the "New Continental Pilot Employment Policy." In its September 19 resolution, the CAL MEC agreed in principle to participate in the $60 million cost reduction plan, but sought to negotiate over its specific terms. The MEC further resolved that the final cost reduction plan would be subject to membership ratification. CAL and ALPA did not agree on a final plan, and on September 24, 1983, CAL filed a bankruptcy petition.

The language of this resolution is unambiguous. It does not grant a blanket right to the membership to ratify all future strike settlements; it plainly accords to the membership the right to ratify the "final cost reduction plan" under discussion at that time. This resolution by its plain language does not support the pilots' asserted right to ratify the strike settlement agreement reached more than two years later.

 The pilots further contend that MEC officials orally assured the pilots throughout the strike that the rank-and-file would be able to vote on any strike settlement.[4] A factfinder might infer a breach of ALPA's duty of fair representation if it finds the union misrepresented the right of the membership to ratify any settlement agreement. *Cf. Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1397 (9th Cir.), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986) ("a duty of fair representation cause of action can be maintained when union representatives make misrepresentations to the union membership during the ratification process"); *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467, 472 (5th Cir.1981). But

misrepresentations by individual MEC members or union officials to pilots do not provide the necessary express grant of a ratification right to the rank-and-file members that is required to support an action under section 101(a)(1).

Ordinarily a ratification right accorded a union's membership is contained in the union's constitution or bylaws. Here the constitution delegated authority to the MEC to decide which agreements the members were entitled to ratify. According to the CAL MEC's policy manual, MEC policy is to be established, amended or rescinded by a majority vote of the MEC. Certainly assurances by individual MEC members to rank-and-file members of a ratification right are not decisions of the MEC body. Where the voting right is not contained in the constitution and bylaws any provision for membership ratification must be clear and unambiguous; to trigger section 101 protection the voting right must be expressly granted according to established policymaking procedures. To imply a voting right where none is clearly provided would impermissibly interfere with the union's organizational structure. *See Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). In sum, we agree with the district court that the union members had no right to approve the settlement embodied in the order and award. Summary judgment was proper as to this claim.

## C. Conclusion

Based on our review of the summary judgment record, we find at least two critical issues of material fact that preclude summary judgment on the union's duty of fair representation claim. First, a factfinder may infer that the settlement agreement negotiated by ALPA was so less favorable to the striking pilots than the likely consequences of a total surrender of the strike effort as to be arbitrary and a breach of

---

**4.** The pilots also argue that section 101 was violated because the union failed to obtain *MEC* approval for the settlement as required in the MEC policy manual. But section 101 only secures certain rights of the rank-and-file members to vote and to participate in their union affairs. Thus, accepting for these purposes the pilots' interpretation of the union policy, the union's violation of the policy by refusing to

allow MEC to approve the settlement is not actionable under section 101 because it is not a right granted to the rank-and-file membership. The pilots have the opportunity on remand to persuade the district court that if the policy requiring MEC approval was violated, this is a predicate for recovery on their unfair representation claim.

the union's duty to fairly represent its members. A jury would also be entitled to find that the agreed-to settlement provisions breached the union's duty of fair representation because it impermissibly and unjustifiably divided the CAL pilots after recall into two camps of former strikers and nonstrikers and permitted CAL to discriminate against strikers. It is unnecessary for us to decide whether additional issues of fact are presented on this claim. We agree with the district court's dismissal of the pilots' section 101 voting rights claim.

The judgment of the district court is therefore VACATED and the case REMANDED for further proceedings consistent with this opinion.