Joseph E. O'NEILL, et al.,
Plaintiffs–Appellants,

v.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, et al.,
Defendants–Appellees.

No. 88–2848.

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1991.

Rehearing Denied Sept. 26, 1991.

Marty Harper, Allen R. Clarke, Lewis & Roca, Phoenix, Ariz., William E. Schweinle, Jr., Reginald H. Wood, Stubberman, McRae, Sealy, Laughlin & Browder, Houston, Tex., for plaintiffs-appellants.

Harold G. Levison, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, John A. Irvine, Thelen, Marrin, Johnson & Bridges, Houston, Tex., for defendants-appellees.

ON REMAND FROM THE UNITED
STATES SUPREME COURT

Before POLITZ, DAVIS and DUHÉ,
Circuit Judges.

**W. EUGENE DAVIS, Circuit Judge:**

This labor case is again before us on remand from the Supreme Court. We conclude that the pilots did not present a triable issue of material fact on the union's alleged bad faith breach of its duty of fair representation. We therefore affirm the district court's summary judgment for the union.

## I.

This dispute arises out of the settlement of a two-year strike by the Air Line Pilots Association, International (ALPA) against Continental Air Lines (Continental).[1] The strike was settled by an "Order and Award" entered by the bankruptcy court supervising Continental's reorganization. ALPA consented to entry of the order and award without notice to or ratification by Continental pilots or the Continental Master Executive Council (MEC).[2] A certified class of Continental pilots then sued ALPA for its actions in connection with the settlement, claiming ALPA breached its duty of fair representation (DFR) under the Railway Labor Act, 45 U.S.C. §§ 151–188.[3] The district court granted ALPA's motion for summary judgment from the bench. We reversed, concluding that a jury would be entitled to find that the strike settlement breached the union's DFR on at least two grounds: (1) it was so unfavorable as to be arbitrary; and (2) it impermissibly discriminated between strikers and nonstrikers. *O'Neill v. Air Line Pilots Ass'n, Int'l*, 886 F.2d 1438, 1448–49 (5th Cir.1989).

The Supreme Court reversed. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. ——, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). The Supreme Court held that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Id.* 499 U.S. at ——, 111 S.Ct. at 1130, 113 L.Ed.2d at 58 (citation omitted). Applying this test, the Supreme Court found that the union's strike settlement was not so unreasonable or discriminatory as to be arbitrary and therefore the union did not breach its DFR on those grounds. However, the Supreme Court noted that "[b]ecause it reversed the District Court's grant of summary judgment on the arbitrariness component, the Court of Appeals did not decide whether summary judgment on the fair representation claim might be precluded by the existence of other issues of fact." *Id.* at ——, 111 S.Ct. at 1133, 113 L.Ed.2d at 61. The Court further "express[ed] no opinion on whether respondents have put forth a triable issue concerning whether ALPA acted in bad faith." *Id.* at ——, 111 S.Ct. at 1133, 113 L.Ed.2d at 61 n. 6.

Thus the question we are faced with on remand is whether the pilots have raised a genuine issue of material fact that ALPA has violated its DFR in bad faith. We find that the pilots have not raised such a triable issue.

## II.

*Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), is "the leading case" in the area of a union's duty of fair representation. *O'Neill*, 499 U.S. at ——, 111 S.Ct. at 1134, 113 L.Ed. at 63. In *Vaca*, Justice White explained:

The statutory duty of fair representation was developed over 20 years ago in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act and was soon extended to unions certified under the N.L.R.A. Under this doctrine, the exclu-

---

1. For a full factual background of this case, see *O'Neill v. Air Line Pilots Association, International*, 886 F.2d 1438, 1440–43 (5th Cir.1989), and *Air Line Pilots Association, International v. O'Neill*, 499 U.S. ——, —— – ——, 111 S.Ct. 1127, 1130–33, 113 L.Ed.2d 51, 58–61 (1991).

2. The MEC is a committee of elected pilot representatives which serves as the ALPA coordinating council for Continental pilots. *See O'Neill*, 886 F.2d at 1441 n. 1.

3. The pilots' complaint actually included four counts, but only the fair representation claim is still viable. *See O'Neill*, 499 U.S. at —— n. 2, 111 S.Ct. at 1131 n. 2, 113 L.Ed.2d at 60 n. 2.

sive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

386 U.S. at 177, 87 S.Ct. at 910 (citations omitted). In other words, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916. Because the Supreme Court has held that ALPA's conduct was neither arbitrary nor discriminatory, the pilots must now rest their DFR claim on ALPA's alleged "bad faith." We turn to the summary judgment evidence relating to this issue.

The pilots assert in their summary judgment evidence that ALPA breached its DFR in bad faith by making several misrepresentations. These include statements to the pilots concerning their ability to ratify any settlement agreement and statements to retired and resigned pilots that they would be included in any settlement. The pilots also assert that ALPA fabricated

a bankruptcy court "gag order" to avoid keeping the MEC informed about final negotiations. Relatedly, the pilots complain that ALPA implemented the settlement as a bankruptcy court order to circumvent ratification requirements and responsibility for its content. Finally, the pilots state that ALPA violated its own internal union procedures that called for the MEC to ratify any settlement agreement.[4] We will address each of these allegations in turn.

## A. Alleged misrepresentations
### 1. *Pilot ratification*

■ The pilots first contend that ALPA promised the pilots throughout the strike that they would be able to ratify any strike settlement with Continental.[5] The pilots argue that these unfulfilled promises of ratification, if proven at trial, show that ALPA breached its DFR in bad faith.

In our original opinion, we held that the pilots had no right to ratify the Continental settlement under section 101(a)(1) of the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411. *See O'Neill,* 886 F.2d at 1447–48. This LMRDA voting rights decision was not appealed to the Supreme Court and is now

**4.** The pilots also offer other pieces of evidence which they assert support a finding that ALPA breached its DFR in bad faith. They contend that after the strike settlement, ALPA disbanded the MEC and disenfranchised pilots so they could not question its conduct or vote for different leadership in upcoming elections, *see* R. 149, Ex. 70, and that ALPA then gave well-paid custodianship jobs as rewards to the negotiators who effectuated the settlement on its behalf, *see id.,* Ex. 21. We agree with ALPA that these statements are largely conclusory, concern incidents which occurred after the settlement, and therefore have little or no value in determining whether ALPA was in bad faith in negotiating the settlement.

**5.** To support their claim, the pilots cite to various affidavits. One of these was not signed by the affiant. *See* R. 149, Ex. 67. Another does not contain the exact date on which the affiant signed it. *See id.* Ex. 94. Several others refer only to what the affiants "understood" to be the case without attributing the alleged misrepresentations to any particular person. *See id.* Ex. 75, at 2 ("At all times during the strike I understood that any agreement reached by the MEC negotiators with Continental had to be brought

back to the striking pilot membership for a ratification vote."); Ex. 96, at 1 ("It was my understanding, based on statements made during these [local] meetings and in the course of conversations all during the strike, that before any agreement was reached with Continental, it would first be brought back for a vote (even if informal) by the Continental pilot ALPA members on strike."); Ex. 47, at 1 ("I was continually assured throughout the Continental strike by members of the [MEC], particularly at [local meetings], that the pilots would have an opportunity to vote on any strike settlement agreement reached with Continental.").

Only two of the cited documents mention specific statements made by named ALPA officials. These ambiguous statements do not contain firm promises assuring the pilots a right to vote on any settlement agreement. *See id.* Ex. 12, at 3 ("Mr. Higgins always said that the Continental pilots 'would have voice' [*sic*] on any settlement with Continental."); Ex. 95, at 2 ("Columbo made numerous statements during the various meetings that as negotiating committee chairman he was trying to get an equitable settlement but did not have authority to do anything without first coming back to the MEC and Continental pilot membership.").

final. *See O'Neill*, 499 U.S. at —— n. 2, 111 S.Ct. at 1131 n. 2, 113 L.Ed.2d at 60 n. 2. While it is now settled that the pilots did not have the right to ratify the Continental settlement, we have never considered directly whether alleged promises of ratification could support the pilots' claim that ALPA breached its DFR in bad faith. The pilots cite to our original opinion in which we said that "[a] factfinder might infer a breach of ALPA's duty of fair representation if it finds the union misrepresented the right of the membership to ratify any settlement agreement." 886 F.2d at 1448. To support our statement, we relied on *Acri v. International Association of Machinists*, 781 F.2d 1393, 1397 (9th Cir.), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986), in which the Ninth Circuit said that "a duty of fair representation cause of action can be maintained when union representatives make misrepresentations to the union membership during the ratification process."

However, ALPA correctly points out that in *Acri*, unlike the instant case, the membership had the right to ratify the agreement. In *Acri*, union members struck over a number of issues including limits on severance pay. At a union meeting, union representatives allegedly misrepresented to the union members that the employer had agreed to remove the opposed limit on severance pay. The union members then ratified the new agreement not knowing that it did not contain a change in the severance pay provision. When the union members later learned of the discrepancy, they sued the union for breaching its DFR. · It is in this context that the Ninth Circuit said that "the duty of fair representation extends to misrepresentations during ratification." 781 F.2d at 1397. Thus the Ninth Circuit was addressing the issue of a union misrepresenting a settlement to its members, thereby eviscerating the members' right to ratify in breach of the union's DFR.[6]

ALPA argues that because the pilots had no such ratification right, ALPA could not have breached its DFR in this way.

We need not address this particular argument, however, because ALPA's alleged statements do not present a triable issue that it breached its DFR in bad faith. As the Seventh Circuit has explained in affirming summary judgment based on similar alleged misrepresentations by a union to its members:

> [E]very inaccuracy should not form the basis of a federal suit. A strike often presents unique pressures. The atmosphere may be tense, charged and confused. The situation is intensely adversary. Decisions and statements are sometimes made in haste, under pressure and in the belief that the other side is disseminating manipulated or distorted information to which a response is required. Union leaders, in exhorting the membership, may voice opinions that later prove inaccurate, or make claims that turn out to be hyperbole. So long as such statements are not intentionally misleading and are not of a nature to be reasonably relied upon by the membership ... they may not rise to the level of invidious actions barred by the duty of fair representation. To conclude otherwise would have a chilling effect on the right to strike itself by instilling a fear of unjustifiable lawsuits.

*Swatts v. United Steelworkers*, 808 F.2d 1221, 1225 (7th Cir.1986); *see also Bautista v. Pan American World Airlines*, 828 F.2d 546, 550–51 (9th Cir.1987) (following *Swatts* in affirming summary judgment dismissing union members' DFR claim for alleged union misrepresentations).

The *Swatts* court's description of the highly charged atmosphere during a heated strike is applicable to the instant case. The Supreme Court accurately described the two-year strike by ALPA of Continental as "acrimonious, punctuated by incidents of

---

6. Although the *Acri* court acknowledged that the plaintiffs had alleged a facially valid DFR claim, it nevertheless affirmed the district court's summary judgment for the union. The Ninth Circuit held that the plaintiffs had the burden of establishing a causal relationship between the alleged union misrepresentations and their injury. Because the employer would not have given in on the severance pay issue even if the strike had continued, the plaintiffs were unable to show the necessary causation. 781 F.2d at 1397.

violence, and the filing of a variety of law suits, charges, and countercharges." *O'Neill*, 499 U.S. at ——, 111 S.Ct. at 1130, 113 L.Ed.2d at 58. It is on this backdrop that the union's alleged misrepresentations were made. Like the Seventh Circuit "we do not condone fabrications designed to mislead the membership," but we agree that "there must be a demanding standard for measuring such violations." *Swatts*, 808 F.2d at 1225. We further agree with the First Circuit that this "demanding standard" should be that the alleged union misstatement must be "sufficiently egregious" to be considered in "bad faith" under the *Vaca* standards for establishing a DFR violation. *Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir.1990); *see also* Note, *Labor Arbitration, the Duty of Fair Representation, and "Union Negligence,"* 54 St. John's L.Rev. 357, 365 (1980) (As a basis for DFR liability, "bad faith ... ha[s] been invoked only to remedy the most egregious union conduct.").

Viewing the summary judgment evidence in the light most favorable to the pilots, we conclude that the pilots have not presented sufficient evidence that the union's misstatements were "sufficiently egregious" or so "intentionally misleading" to be "invidious" and therefore meet the "demanding standard" of a bad faith breach of ALPA's DFR. Thus the district court correctly granted summary judgment on this issue.

### 2. *Retired and Resigned Pilots*

■ The pilots next argue that ALPA violated its DFR in bad faith by misrepresenting to retired and resigned pilots that they would be included in any settlement with Continental. The pilots allege that, despite these promises, ALPA did not represent pilots who retired or resigned during the strike.[7] The pilots further contend that even after ALPA had conceded the retired/resigned pilot issue to Continental, ALPA continued to tell the pilots they would be included. The pilots argue that ALPA's alleged misrepresentations to the retired/resigned pilots support their bad faith DFR claim in the same way as the other alleged union misrepresentations discussed above.

ALPA argues that a DFR is only owed to employees of a unit and that because the retirees were no longer part of the Continental bargaining unit, they had no duty to represent them.[8] *See Allied Chem. & Alkali Workers Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971) ("Since retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer."); *Anderson v. Alpha Portland Indus., Inc.*, 727 F.2d 177, 181 (8th Cir.1984) ("[T]he union owes no duty of fair representation to retirees since the union's duty runs only to employees within the bargaining unit for whom the union acts as exclusive bargaining representative."), *aff'd en banc*, 752 F.2d 1293, *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 846 (1985). ALPA argues that even a promise of representation to a retiree would not implicate the DFR. *See Meza v. General Battery Corp.*, 908 F.2d 1262, 1272–73 & n. 11 (5th Cir.

---

**7.** Apparently, the district court did not reach this issue. *See* R. 159, at 3 ("I am not going to rule ... on the nature of the resulting relationship between Continental and a retired pilot because the retirement questions are subjudice [*sic*] elsewhere.").

**8.** ALPA also contends that the pilots' claim that retirees would be included in any settlement does not appear anywhere in the complaint. While this appears true, the complaint does state that "ALPA and CAL MEC owed a duty of fair representation to all Continental pilots, including all Plaintiffs, at all times relevant to this Complaint." *See* R. 14, Count 1, ¶ 24. Because retired pilots were included in the class of plaintiffs (*see* R. 14, ¶ 13, at 6 (defining class as "all Continental pilots who withdrew their services from Continental at any time from October 1, 1983, through October 31, 1985, and who were not working for Continental on October 31, 1985"); R. 139 (certifying class)), they were included in the plaintiffs' claim of breach of DFR in bad faith. While ALPA's alleged misrepresentation that retirees would be included in any settlement is not specifically noted in the complaint, the complaint does contain general allegations that ALPA breached its DFR in bad faith. These allegations satisfy notice pleading requirements.

1990) (Even if the Union volunteered to represent former employee, "it is doubtful whether the Union owed him a duty of fair representation.").

Again we need not reach the issue of whether retirees are owed a DFR in this situation. Assuming such a duty exists, ALPA did not breach it in bad faith. First, the pilots rely on alleged misrepresentations made to a single retired pilot. The first one was allegedly in a statement by MEC Chairman Dennis Higgins in a December 1984 meeting; the other was allegedly included in an equivocal letter from ALPA President Henry Duffy in September 1985. As the text of the relevant summary judgment evidence in the margin shows, these statements do not rise to the level of bad faith intentional misrepresentations designed to harm the retired pilots.[9] Second, even if ALPA sacrificed benefits to the retired pilots for the greater good of the entire union membership, this choice will not support an inference of a bad faith breach of ALPA's DFR. In negotiating

conflicts such as the one ALPA faced with Continental, some groups within the union will always fare better than others. Arriving at a compromise that includes disparate benefits for various groups is not per se outside ALPA's discretion or the "wide range of reasonableness," *see Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), to which it is entitled as the pilots' duly chosen bargaining representative. The Supreme Court has held that this settlement was not arbitrary or discriminatory. The summary judgment record will not support an inference that it was made with a bad faith motive to harm retirees. The district court correctly granted summary judgment on this issue.

### B. Alleged misconduct concerning court order

The pilots next contend that ALPA fabricated a bankruptcy court "gag order" to avoid keeping the MEC informed about the final negotiations[10] and then schemed

---

**9.** An affidavit from retired pilot Karl E. Newton states the following:

2. I attended a pilot meeting in December 1984 at the ALPA strike center in San Diego, California. Continental Master Executive Council ("MEC") Chairman Dennis Higgins made a presentation at that meeting on the Continental strike. Mr. Higgins stated unequivocally that ALPA would continue to represent all striking pilots in any back-to-work agreement with Continental, including pilots who were forced to retire or resign during the strike, such as myself. Mr. Higgins further stated that there was no difference from his point of view between the pilots forced to retire or resign during the strike and other striking pilots with respect to their entitlement to return to work and ALPA's continued representation.

3. I heard other statements like the statements made by Mr. Higgins at the December 1984 meeting throughout the strike, both before and after December 1984. Although I do not recall the specific dates and sources of many of those statements, the consistent communication from the MEC and from ALPA was that pilots who were coerced to retire or resign would continue to be represented and would be included in any back-to-work agreement with Continental.

. . . .

5. I submitted my retirement letter to Continental in full belief that ALPA would continue to represent me and would be sure to include me in any back-to-work agreement at

Continental, based upon statements I heard from ALPA and the MEC at the time.

R. 149, Ex. 42.

A September 1985 letter from ALPA President Henry Duffy to retired pilot Karl E. Newton states the following:

The Continental MEC recognises [*sic*] that many members have had to retire or resign due to financial difficulties.

Thus far in negotiations the Company has take [*sic*] a very rigid position against pilots who have already retired. ALPA national has no policy on this issue and will rely on the judgment of the MEC to reflect the best interest of the CAL pilot group. My indications from talking to Captain Higgins agree with what you heard at the December 1984 meeting in San Diego concerning this subject. It is one thorny issue that will be difficult to settle in our Back-to-Work Agreement.

However, when it comes time to sit down and negotiate a Back-to-Work Agreement, it is the MEC's full intention to represent all CAL pilots.

*Id.* Ex. 91.1.

**10.** *See* R. 149, Ex. 48, at 3 ("I was told by those who were involved in the negotiations that a 'gag order' had been imposed by Judge Roberts and, as a result, the MEC members were prevented from finding out about what was going on during these negotiations."); Ex. 9, at 85 ("Q. [D]id Judge Roberts ever issue any orders or directives either in writing or orally to Conti-

with Continental to impose the strike settlement as a court order.[11] The pilots then assert that ALPA blamed the terms of the settlement on the bankruptcy judge and disclaimed any role in agreeing to them.[12] The pilots contend that if the MEC had known of the deal, members would have opposed the settlement because it was poor and improperly dismissed pending litigation against Continental and foreclosed ALPA assistance of future claims. The pilots contend that ALPA confected the settlement secretly to prevent such MEC opposition. They also argue that ALPA wanted the settlement agreement issued as a court order to avoid being held accountable for any of its terms.[13]

First, we note that the pilots' contentions about the inadequacy of the settlement cannot in themselves support their claim for a bad faith breach of ALPA's DFR. Because the Supreme Court found that the settlement would not support an arbitrary or discriminatory breach of ALPA's DFR, a fortiori, the settlement may not support a breach of that DFR in bad faith.

ALPA also argues that the court order gave it an enforcement mechanism to deal with what the Supreme Court has termed the "determined resistance by Continental at all stages of this strike." *O'Neill*, 499 U.S. at ——, 111 S.Ct. at 1137, 113 L.Ed.2d at 66. ALPA further argues that the pilots' allegations of a "gag order" and secrecy surrounding negotiations, merely point to a desire to end the strike in the fashion that they did, *i.e.*, through the Order and Award. ALPA argues that these allegations do not imply that ALPA acted in bad faith. The district court agreed, concluding that "the fact that [ALPA] used every tactic available to them to insure that their resolution of the dispute would not be upset cannot be translated into personal animosity or illegal motives against these pilots." [14]

We agree with the district court. As explained above, while we may not have ended the strike in the same fashion as ALPA did, we cannot say that their choice of having a settlement entered by a bankruptcy court was outside a "wide range of reasonableness." Likewise it was within that wide range for ALPA to believe that secrecy concerning negotiations with Continental and the bankruptcy judge was necessary to conclude the deal. Finally ALPA's alleged misrepresentations concerning the "gag order" and its part in the negotiations do not rise to the level of

---

nental ... with respect to the conduct of negotiations? A. No."); Ex. 10, at 68 ("Q. [D]id Judge Roberts issue any orders that would have restricted the ALPA negotiators from discussing the substance of negotiating proposals with the union representatives? A. I don't recall any."); Ex. 50 (union negotiating notes referring to "numbers—can't share because of judicial order"); *see also* Ex. 49, at 49, at ¶ 17(H) ("There shall be no restrictions on communications between the pilot negotiators and the members of the MEC....").

11. *See* R. 149, Ex. 9, at 179 ("As I recall it, [the union negotiator] was suggesting that ... the prior agreements already reached by the parties would be embodied in and adopted by a final interest arbitration award to be entered by Judge Roberts. So he was not suggesting, at least Continental never understood him to suggest and never agreed to a procedure whereby the agreements of the parties would be subject to being rewritten or reviewed by the court."); Ex. 10, at 115 (When asked why the title of the settlement document was changed from "Back to Work and Claims Settlement" to "Order and Award," the deponent responded that the union negotiator told Continental "that ALPA wasn't

going to sign the agreement, that they would want it to be entered by the Court."); *id.*, at 116 (When asked why the signature lines were crossed out on one of the versions, the deponent responded, "I think it was related to the discussion I just told you about.").

12. *See* R. 149, Ex. 15, at Z001050 (Letter from ALPA President Henry Duffy concerning the settlement: "As with all resolutions imposed by a third party, we did not get everything we wanted.").

13. The pilots specifically argue that ALPA President Duffy wanted to end the strike in order to get reelected, but that he did not want to be held responsible for the settlement's terms. *See* R. 149, Ex. 70. We agree with ALPA that even if Duffy had some political motivation in ending the strike, that does not support an inference that his conduct in settling the strike was in bad faith. In this instance Duffy's motives and the motives of the membership at large—*i.e.*, to end the strike as quickly as possible—were necessarily aligned.

14. *See* R. 159, at 6.

"egregious conduct" intentionally harming the membership needed to support a breach of its DFR in bad faith. The district court correctly granted summary judgment on this issue.

### C. Alleged violation of union policy

■ Finally, the pilots argue that ALPA breached its DFR in bad faith by not following its own internal union procedures. The pilots contend that ALPA did not follow the MEC policy manual requirements that ALPA negotiators keep the MEC informed of negotiations and that the MEC ratify any final agreements.[15] Although it is now settled that the pilots themselves did not have the right to ratify any settlement agreement, the pilots argue that the 1980 MEC policy manual gave their elected representatives ratification rights. ALPA contends that this manual was superseded first by the 1982 ALPA Constitution[16] and then by MEC resolutions passed in 1984[17] and 1985.[18] The pilots contend that neither of these resolutions could abrogate the MEC policy manual because, according to the manual, any such changes required presentation to the membership before taking effect and no such presentation occurred here.[19] The pilots further argue that the 1985 resolution authorizes negotiators only to "pursue" a settlement with Continental, not to conclude one. They also claim that affidavits showing that the 1985 resolution

did not authorize the negotiators to make a final agreement without approval[20] preclude a finding that the resolution conferred authority on them to reach an agreement without ratification.

While the district court found that the 1984 resolution was "not properly part of the policy of [the MEC]," it further found that "what was done through other meetings was sufficient, I think, to confer authority on the negotiating agents for the MEC, who were the general agents for the membership."[21] The district court explained, "I have seen nothing in the documents that would preclude the conferring of a plenary binding general agency on some representative sent to negotiate the contract, whether it's a working agreement or back-to-work agreement."[22] ALPA argues that the district court properly interpreted the various union documents as providing for no ratification by the full MEC of its own negotiators' settlement.

Moreover, ALPA correctly argues that, as a union, its interpretation of its own governing documents should be accorded deference "unless it is 'patently unreasonable.' " *Newell v. International Bhd. of Elec. Workers,* 789 F.2d 1186, 1189 (5th Cir.1986) (citations omitted). The pilots argue that because ALPA has acted in bad faith, we may not simply defer to its interpretation. *See Motion Picture & Video-*

---

**15.** *See* R. 149, Ex. 49, at 48, ¶ 17(E)(2)(d) ("It shall be the [negotiating committee's] obligation to keep the MEC fully informed as to the progress of negotiations."); *id.,* at 49, ¶ 17(F) ("The final step in the conclusion to a CAL pilot working Agreement or any side letter of agreement shall be ratification by the CAL MEC.").

**16.** The 1982 Constitution provides that "[t]he conclusion of an agreement shall, at the discretion of the Master Executive Council, be subject to ratification." ALPA Const. § 2, cited in *O'Neill,* 886 F.2d at 1447.

**17.** This resolution provided that "the Negotiating Committee is authorized to conclude a strike settlement as a product of negotiations and/or the use of a third party process, without ratification." *See* R. 131, Higgins Aff., ¶ 15.

**18.** This resolution provided that "the equitable resolution and settlement of outstanding issues be pursued under the direction of the MEC

Officers and Negotiating Committee Chairman." *See* R. 131, Higgins Aff., ¶ 16.

**19.** *See* R. 149, Ex. 49, ¶ 1(H) ("All new or amended CAL MEC policies shall be presented to the membership for explanation and discussion as agenda items at the next regular meeting of all Local Councils.").

**20.** Of the two "affidavits" cited by the pilots to support their claim one is unsigned by the affiant. *See* R. 149, Ex. 67. The other is an interpretation by the affiant of the effect of the 1985 resolution. *See* R. 149, Ex. 48, at 2 ("[I]t is my position that [after the 1985 resolution] the MEC had not given up its right to veto any agreement that the MEC officers and Negotiating Committee might have been able to obtain with Continental.").

**21.** *See* R. 159, at 4–5.

**22.** *See* R. 159, at 5.

*tape Editors Guild, Local 776 v. International Sound Technicians, Local 695*, 800 F.2d 973, 975 (9th Cir.1986) (a court should not disturb a union's interpretations of its own documents "absent bad faith"), *cert. denied*, 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 765 (1987). However, as explained above, the pilots have not met the "demanding standard" to demonstrate ALPA's bad faith. Thus we defer to ALPA's interpretation of the 1985 resolution, the 1982 Constitution, and their combined effect on the 1980 MEC policy manual. ALPA's interpretation of its governing documents is not unreasonable and by following its own interpretation ALPA did not breach its DFR in bad faith.[23] The district court correctly granted summary judgment on this issue.

In conclusion, we find that the pilots have not presented sufficient evidence to raise a triable issue on ALPA's alleged bad faith breach of its duty of fair representation. Accordingly, the judgment of the district court dismissing the pilots' suit is

AFFIRMED.

---

**23.** In our original opinion, we said that "[t]he pilots have the opportunity on remand to persuade the district court that if the policy requiring MEC approval was violated, this is a predicate for recovery on their unfair representation claim." *O'Neill*, 886 F.2d at 1448 n. 4. However, we had not considered the pilots' bad faith claim and therefore accepted "the pilots' interpretation of the union policy." *Id.* As explained above, because the pilots have not made a bad faith case against ALPA, we must defer to ALPA's interpretation of its own governing documents rather than the pilots' interpretation.