In re CONTINENTAL AIRLINES
CORP., et al., Debtors.

CONTINENTAL AIRLINES, INC. and
The Continental Airlines Working Pi-
lots Committee, Appellants–Cross Ap-
pellees,

v.

AIR LINE PILOTS ASSOCIATION, IN-
TERNATIONAL, and Joseph E. O'Neill,
et al., Appellees–Cross Appellants.

In the Matter of CONTINENTAL AIR-
LINES CORP., et al., Debtors.

CONTINENTAL AIRLINES,
INC., Appellant,

v.

James B. EVANS, et al., Appellees.

In the Matter of CONTINENTAL AIR-
LINES CORP., et al., Debtors.

CONTINENTAL AIRLINES,
INC., Appellant,

v.

Joseph E. O'NEILL, et al., Appellees.

In the Matter of CONTINENTAL AIR-
LINES CORP., et al., Debtors.

CONTINENTAL AIRLINES,
INC., Appellant,

Continental Airlines Working Pilots
Committee, Intervenor–Appellant,

v.

Joseph E. O'NEILL, et al., Appellees.

Nos. 89–2381 to 89–2384.

United States Court of Appeals,
Fifth Circuit.

July 25, 1990.

**1502**

John J. Gallagher, Jon A. Geier, Charles L. Warren, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Daniel P. Casey, Asst. General Counsel, Continental Airlines, Inc., Houston, Tex., for Continental Airlines.

Gary L. Lieber and John A. McGuinn, Porter, Wright, Morris & Arthur, Washington, D.C., for Former Frontier Pilots.

John A. Irvine, James E. Miller, Thelia, Marrin, Johnson & Bridges, Houston, Tex., for Air Line Pilots Ass'n.

Jeanne M. Lawson, Los Angeles, Cal., for Booth, et al.

H. Christopher Mott, Hagans, Ginnings, Birkelbach, Hamm & Cardi, Inc., El Paso, Tex., for Diffenderfer.

Brent C. Gamble, Houston, Tex., for Watkins and Havens, et al.

B.J. Walter, Jr., Michael P. Stevens, Lackshin & Nathan, Houston, Tex., for Continental Working Pilots, C.A.W.P.C.

Randolph J. Haines, Marty Harper, Allen R. Clarke, Jessica Franken, Lewis & Roca, Phoenix, Ariz., for O'Neill Group Pilots.

Kathleen M. Schaden, Schaden, Heldman & Lampert, Denver, Colo., for Adair, et al.

James R. O'Donnell and Leon Komkov, Butler & Binson, Houston, Tex., for Stephens, et al.

John L. Webb & Assoc., Houston, Tex., for Moody.

Ronald Baxter, Humble, Tex., pro se.

Ken Doskocil, San Bernadino, Cal., pro se.

James B. Evans, Winter Haven, Fla., pro se.

Mark J. Heinrich, Kingwood, Tex., pro se.

Doug Hill, Aurora, Colo., pro se.

Robert L. Johnson, Diamond Bar, Cal., pro se.

James Sehorn, pro se.

Before THORNBERRY, POLITZ, and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge.

A "final, binding, non-appealable" Amended Order and Award ("the settlement") was entered on November 19, 1985 in settlement of bankruptcy claims, numer-

ous lawsuits, and a bitter two-year strike by the union against the airline. Because the settlement resolved bankruptcy claims and was reached before confirmation of a reorganization plan, it was submitted to the bankruptcy court for approval pursuant to Bankruptcy Rule 9019(a). The bankruptcy court approved the settlement on December 27, 1985, over the objections of some affected pilots. In January 1987, however, after a year of motions to modify, clarify, and enforce the settlement, and hearings with respect to the pilots' objections to the back-to-work provisions, the bankruptcy court set aside the earlier order approving the settlement and entered a nunc pro tunc order approving the settlement upon certain new conditions. During the pendency of the airline's appeal of the nunc pro tunc order to the district court, the bankruptcy court entered three more orders "interpreting" the settlement. The efforts of the bankruptcy court and the district court to address the pilots' labor-related objections culminated in these consolidated appeals. We have thoroughly considered the briefs and arguments of counsel, as well as the voluminous record in this case, and we conclude that the interests of all of the parties concerned require the enforcement of the settlement according to its terms.

## I

On September 24, 1983, Continental Airlines, Inc. ("Continental") filed for protection under Chapter 11 of the Bankruptcy Code. Three days later, Continental sought bankruptcy court approval to reject its collective bargaining agreement with the Air Line Pilots Association ("ALPA") pursuant to 11 U.S.C. § 365.[1] On October 1, 1983, ALPA commenced a strike against Continental. On July 2, 1985, the bankruptcy court ordered Continental and ALPA to conduct settlement negotiations

for the purpose of expediting the achievement of a plan of reorganization. ALPA and Continental engaged in intensive settlement negotiations, and the strike and many related disputes were finally resolved in October 1985. During the negotiations, Bankruptcy Judge T. Glover Roberts acted as a mediator, and Continental and ALPA were able to reach agreement on many of the issues. On October 30, 1985, in order to conclude their negotiations, Continental and ALPA agreed to designate Judge Roberts as an interest arbitrator,[2] with authority to resolve finally and conclusively the issues that remained to be resolved.[3]

On October 31, 1985, Judge Roberts, exercising his "equitable powers pursuant to Section 105 of the Bankruptcy Code, and as an interest arbitrator pursuant to the agreement and consent of ALPA and Continental," entered an "Order Relative to Claims, Controversies and Related Litigation." The ALPA–Continental settlement was embodied in an "Order and Award" also dated October 31, 1985, and the Order and Award was attached as an exhibit to the Order Relative to Claims, Controversies and Related Litigation. Upon agreement and request of the parties, Judge Roberts issued an "Amended Order and Award" on November 19, 1985. The Amended Order and Award did not change the Order and Award in any respect that is relevant to these appeals.

Section I of the settlement contained detailed provisions for the termination of the ALPA strike and created procedures for the return of striking pilots to work at Continental. The settlement offered three options to "eligible" striking pilots, who are defined as "[a]ll pilots on the July 31, 1983 seniority list who are not currently active or on authorized leave and who have not resigned, retired, or been terminated

---

**1.** On June 19, 1984, the bankruptcy court approved the rejection of Continental's collective bargaining agreement with ALPA.

**2.** An interest arbitrator is a privately-designated decisionmaker to whom the parties to a dispute by agreement delegate some or all of their freedom to contract, i.e., the authority to create the terms of an agreement rather than merely to

interpret or apply those terms as in more traditional arbitration. *See NLRB v. Columbus Printing Pressmen Union,* 543 F.2d 1161, 1163 n. 4 (5th Cir.1976).

**3.** The record does not reveal what unresolved issues were submitted to Judge Roberts for resolution.

for cause." The first option provided for recall in seniority order in exchange for a waiver of certain claims against Continental and its affiliates; the second option provided for severance pay in exchange for the same waiver of claims; and the third option provided that pilots could retain their "individual" claims and return to work after the return of pilots who waived their claims. Each eligible pilot was sent a "Notice of Options" and had twenty-one days after receipt of the notice in which to elect an option.

The settlement further provided that, barring an intervening reduction in force, all pilots electing the option to return to work would retain their right to reinstatement until December 31, 1988, at which time the names of any unreinstated pilots would be removed from the seniority list.

The settlement gave Continental the right to assign the "initial base and equipment of a returning striker" and also established a methodology for allocating captain vacancies among working pilots and returning striking pilots.[4] The system for allocating captain vacancies placed two temporary, transitional restrictions on the exercise of seniority rights by the returning striking pilots. One curtailment gave Continental the discretionary right to assign the "base and equipment of a returning striker in his/her initial post-strike service as a Captain." The other restriction provided that working pilots were to receive the first 100 captain vacancies awarded in vacancy bid 1985–5, returning strikers the next seventy positions, and thereafter returning strikers and working pilots were to be awarded captain vacancies on a 1:1 ratio.

Sections II and III of the settlement included provisions resolving bankruptcy claims and other litigation then pending between Continental and ALPA. ALPA was to dismiss all bankruptcy claims and other litigation (with certain limited exceptions) against Continental. Continental was obligated to dismiss litigation against ALPA, and against any individual pilots who elected one of the options requiring a waiver of their claims against Continental.

Section III of the settlement contains a dispute resolution mechanism:

> Any disputes which may arise concerning the interpretation, or application of the terms of this Order and Award, ... may be submitted by the affected pilot in writing to the Company. If the dispute is not satisfactorily resolved within five (5) days, the affected pilot may submit the dispute forthwith to the Bankruptcy Court as an adversary proceeding.

Section III also provides that the bankruptcy court will retain jurisdiction to enforce the Amended Order and Award:

> The Bankruptcy Court shall retain jurisdiction, both pending plan confirmation, and post-confirmation, to enforce the terms of this Order and Award. The provisions of this Order and Award shall expire no later than the date on which the last returning striker assumes a Captain position at Continental Airlines.

## II

Continental presented the settlement to the bankruptcy court for approval pursuant to Bankruptcy Rule 9019(a). Several groups of pilots objected to the settlement, claiming, among other things, that (1) the settlement would result in the dismissal of bankruptcy claims ALPA had filed on their behalf; (2) the settlement improperly excluded resigned and retired pilots from the back-to-work and severance options; and (3) the settlement operated unfairly because the number of pilot positions, specifically captain positions, available to returning strikers under the settlement might be reduced in the event of the merger of another airline with Continental. No other creditors objected to the settlement.

---

**4.** A "working pilot" is defined in the settlement as "a pilot in active service (including flight instructors, supervisory and management pilots), in training, or on authorized leave as of September 15, 1985." A "returning striking pilot" or "returning striker" is defined as "a pilot on strike as of September 15, 1985 (including those on the preferential recall list) who elects recall pursuant to the terms of this Order and Award."

On December 27, 1985, after three days of evidentiary hearings, the bankruptcy court (Judge Wheless) entered an order approving the settlement (the "Order Approving Settlement"). The bankruptcy court conditioned its approval on Continental's acceptance of (1) modifications to the bankruptcy claims portion of the settlement so as not to prejudice the claims of pilots who had relied upon ALPA to file certain types of claims on their behalf and who wished to retain such claims, and (2) a procedure whereby a pilot could apply to the bankruptcy court for individualized relief by filing a "hardship application." The Order Approving Settlement further provided, however, that Continental would have the right "to elect to opt out of the settlement as to those pilots asking for hardship relief." Noting that the settlement encompassed a "myriad of individual situations and circumstances," the court found the settlement as modified to be "fair and equitable" and "in the best interests of the estate." The Order Approving Settlement authorized and directed Continental to implement the settlement, but gave Continental until December 31, 1985 to opt out of the entire agreement if the conditions imposed in the Order Approving Settlement were unacceptable. Continental did not opt out.

Shortly thereafter, in January 1986, motions to alter or amend the Order Approving Settlement were filed by two groups of affected pilots. Those motions sought modifications related to (1) the scope of the claims intervention procedure, (2) the scope of the hardship application procedure and Continental's right to opt out of the settlement as to pilots seeking hardship relief, (3) ALPA's continuing role in assisting individual pilots, and (4) an extension of the period for pilots to apply for intervention in pending bankruptcy claims or option re-selection.

During 1986, various motions were filed by ALPA and pilot groups seeking to compel Continental to comply with their interpretation of the terms of the settlement. On October 3, 1986, a hearing was held on the O'Neill Group's Emergency Motion to Compel Compliance with Amended Order and Award. In that motion, the O'Neill Group argued that the then-pending integration of New York Air pilots with Continental pilots violated the settlement. At that hearing, the court ruled that "New York Air pilots should not participate in the bid to the prejudice of Option Three pilots before all Option Three pilots are recalled."

On October 20 and 31, 1986, the bankruptcy court held hearings related to a "hardship application" filed by a group of five striking pilots (the Best Group).[5] All of the evidence introduced at those hearings related solely to the Best Group's complaint. At the conclusion of the October 31 hearing, in response to Continental's argument that it had exercised its opt out rights as to the Best Group's hardship application, the bankruptcy court announced that it was "going to set aside the entire Order and Award. And I'll start over ... [i]n order that I can reconsider the entire question of whether or not this settlement operates unfairly and prejudicially to some groups."

On December 29, 30, and 31, 1986, hearings were held on a motion by ALPA to enforce the settlement insofar as it related to the "foreign" pilots. At the conclusion of those hearings, the bankruptcy court ruled that the awarding of pilot vacancies from a bid list, which was integrated with pilots of an acquired airline, violated the settlement.

On January 9, 1987, the bankruptcy court entered an "Order Setting Aside the December 27, 1985 Order Approving the ALPA–Continental Settlement and Entering Nunc Pro Tunc Order" (the "Nunc Pro Tunc Order"), approving the settlement

**5.** The members of the Best Group were five of the nineteen striking pilots who had placed their names on Continental's preferential recall list prior to September 15, 1985. The other fourteen such pilots are the subject of the January 22, 1987 Order on Group of 14. The Best Group claimed that they had suffered a hardship because they had decided to abandon the strike before the settlement and should not be treated as returning strikers. Continental eventually settled its dispute with the Best Group.

upon certain new conditions. The Nunc Pro Tunc Order (1) extended the date by which Option 3 pilots had to decide whether to return to work until all appeals of the Nunc Pro Tunc Order were resolved; (2) extended indefinitely the time during which pilots could file hardship applications, and provided that Continental could not "opt out" as to pilots claiming hardship; (3) created reinstatement rights under the settlement for pilots who had "involuntarily" resigned or retired during the strike; and (4) ordered Continental to "fence off" foreign pilots from flying existing Continental routes and planes unless Continental restored full, uncurtailed seniority bidding rights to returning strikers. The Nunc Pro Tunc Order further required Continental to dismiss litigation against individual pilots, without regard to the eligibility of such pilots for one of the settlement options, and permitted ALPA to withhold compliance with the settlement until all appeals of the Nunc Pro Tunc Order had concluded. In addition, the Nunc Pro Tunc Order allowed Option 3 pilots to change their option selection to Option 1, and created a new Option 1A for those Option 3 pilots and resigned or retired pilots who elected to obtain the benefits of an Option 1 pilot. The Nunc Pro Tunc Order provided that fourteen pilots who had been awarded captain vacancies in a pre-settlement system vacancy bid, but who had not yet been recalled at the time of the settlement, were classified as neither working pilots nor returning strikers and were entitled to immediate recall. Finally, the Nunc Pro Tunc Order interpreted the Order and Award as providing that Option 1 pilots were entitled to advance to captain positions ahead of Option 3 pilots.

Continental and the Continental Working Pilots' Committee (the "Working Pilots") appealed the Nunc Pro Tunc Order to the district court, and sought a stay pending appeal. The bankruptcy court denied the stay. On January 16, 1987, the district court granted a stay pending appeal and directed the parties to "proceed under" the settlement as implemented by the Order Approving Settlement. In less than two weeks after the district court granted Con-

tinental's request for a stay, the bankruptcy court issued three orders purporting to interpret the settlement: the Order on Resigned and Retired Pilots, the Order Prohibiting Integration, and the Order on Group of 14 (the "January Orders").

In the Order on Resigned and Retired Pilots, the court stated that, in approving the Amended Order and Award, it had interpreted the words "resigned and retired" "to exclude only those pilots who have *voluntarily* resigned or retired. Any pilot who was coerced into resigning or retiring as a result of actions of Continental Airlines ... shall be, and are, eligible to participate in the three options provided for in the Amended Order and Award."

The Order Prohibiting Integration interpreted the Amended Order and Award as forbidding Continental to fully integrate pilots of acquired airlines into its bid system until all former striking pilots had regained plenary use of their seniority. The Order further provided that pilots of acquired airlines "may fly the airplanes and routes from bases of the acquired or merged airlines, but are to be fenced off of Continental's seniority list until all of the pilots on Continental's seniority list just prior to their strike return or until their right to return is expired."

The Order on Group of 14 provided that fourteen striking pilots whose names had been placed on the recall list prior to the strike settlement, and who had been awarded positions on a pre-settlement vacancy bid, but who had not yet been recalled at the time of the settlement, were to be recalled to their positions on the vacancy bid rather than to the positions they would receive as recalled strikers under Option 1 or Option 3.

Arguing that the January Orders granted relief identical to the relief granted in the bankruptcy court's Nunc Pro Tunc Order, and thus violated the district court's stay order, Continental filed with the district court a petition for writ of prohibition or, in the alternative, motion to enforce stay. Continental also filed timely notices of appeal from the three January Orders.

On July 17, 1987, the district court, acting upon Continental's petition for writ of prohibition, held that the January Orders violated the stay, were beyond the bankruptcy court's jurisdiction, and were therefore "null and void." ALPA and the O'Neill Group appealed to this court. On April 1, 1988, this court dismissed those appeals on the ground that the July 17 order was not a final order. This court also vacated the January 16, 1987 stay order insofar as it could be interpreted to extend beyond the subject matter of the January Orders, and ordered expedited consideration of all appeals pending before the district court arising out of the Continental bankruptcy.

At a February 27, 1989 hearing, the district court stated that it sought to "package" the ALPA settlement orders for appeal to this court. Accordingly, on March 13, 1989, the district court entered orders in Continental's appeals from the January Orders, reinstating and affirming those orders. Continental requested and obtained a stay of two of those orders (the Order on Resigned and Retired Pilots and the Order Prohibiting Integration) pending appeal to this court.

On April 7, 1989, the district court entered a final order in Continental's appeal from the Nunc Pro Tunc Order. The court vacated the Nunc Pro Tunc Order except for the provision extending the recall acceptance deadline for Option 3 pilots. The district court further ordered that the recall acceptance deadline should be extended for all pilots until the completion of all appellate and remand proceedings relating to the Order Approving Settlement. In the April 7 order the district court stated that "the Bankruptcy Court should not have set aside the original order approving the settlement in order to make interpretations or modifications of that order. The more reasoned method of modifying or interpreting the December 27, 1985 [Order Approving Settlement] ... would be to issue separate

orders on each issue as the Bankruptcy Court did in three orders dated January 22 and 27, 1987." Continental appeals the portion of the district court's April 1989 Order extending and modifying the recall acceptance deadline, and the district court's orders reinstating and affirming the January Orders. ALPA cross-appeals the district court's order to the extent it vacated the Nunc Pro Tunc Order's interpretations on foreign pilots and the dismissal of litigation against certain defendants, and to the extent it failed to address ALPA's cross-appeal to the district court (regarding advancement of Option 1 pilots to captain positions ahead of Option 3 pilots). The O'Neill Group cross-appeals the April 1989 Order to the extent that the Order vacated the Nunc Pro Tunc Order. The April 1989 Order was stayed in part by the district court on June 26, 1989.

### III

We first examine the source of the bankruptcy court's authority to enter the various orders on appeal. In their briefs, the parties have argued, at considerable length, over whether the bankruptcy court has the authority, under its general equitable powers and Bankruptcy Rule 9019(a), to modify the labor provisions of the settlement. At oral argument, the parties primarily focused on the bankruptcy court's authority under the enforcement provision of the settlement. Although all of the parties agree that the settlement should be enforced, and further agree that the settlement gives the bankruptcy court the authority to interpret and enforce its terms, they strongly disagree as to what it means and how it should be applied. They further disagree as to the extent of the court's interpretative powers and whether the subsequent orders of the bankruptcy court should be characterized as "interpretations" or "modifications" of the settlement.[6]

---

**6.** We note that another panel of this court described the settlement as a "consent decree." *See O'Neill v. Air Line Pilots Ass'n,* 886 F.2d 1438, 1444 (5th Cir.1989). We agree that the settlement resembles a consent decree, at least

with respect to the provisions that were agreed upon by the parties. Nevertheless, because the parties were unable to reach agreement on all of the issues and consented to submit those unresolved issues to Judge Roberts in his capac-

Although the O'Neill Group primarily argues that the bankruptcy court only interpreted and enforced the settlement, it contends, in the alternative, that the bankruptcy court properly entered all subsequent orders under its authority to modify the settlement. Although the record is far from clear, the bankruptcy court apparently assumed that it was acting under the authority of the Bankruptcy Code as well as the authority granted by the parties in the settlement, and the parties' designation of Judge Roberts as an interest arbitrator. Thus, we first determine the source of the authority of the court to issue the orders in question. We look at Bankruptcy Rule 9019(a), the bankruptcy court's equitable powers, the parties' designation of Judge Roberts as an interest arbitrator, and the terms of the settlement, and conclude, for the reasons we set out below, that the settlement itself is the source of the bankruptcy court's authority with respect to the labor provisions of the settlement.

### A

As we have already noted, the settlement was presented to the bankruptcy court for approval pursuant to Rule 9019(a), which states:

> On motion by the trustee and after a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule 2002(a) and to such other persons as the court may designate, the court may approve a compromise or settlement.[7]

The bankruptcy court initially approved the settlement, finding it to be fair and equitable and in the best interest of the estate.

In the Nunc Pro Tunc Order, the bankruptcy court set aside the earlier Order Approving Settlement, and reapproved the settlement upon new conditions. Continental and the Working Pilots argue that the bankruptcy court had no authority, under Rule 9019(a), to impose new conditions for approval of the settlement on the basis of labor considerations unrelated to the success of the reorganization. In support of their argument, they rely on *In re AW-ECO, Inc.*, 725 F.2d 293, 297 (5th Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984), a case that involved the predecessor to Bankruptcy Rule 9019(a). In *AWECO*, this court held that a court may approve a compromise or settlement that forms part of a plan of reorganization only when it is "fair and equitable." "The words 'fair and equitable' are terms of art—they mean that 'senior interests are entitled to full priority over junior ones.'" *Id.* at 278.

The O'Neill Group contends that, under the "fair and equitable" standard, the bankruptcy court may also consider whether the settlement is fair and equitable to the debtor's employees. We agree that the bankruptcy court should consider the interests of employees in deciding whether a compromise will be in the best interest of the estate and enhance the success of the reorganization. We cannot agree, however, that Rule 9019(a) gives the bankruptcy court the power to condition its approval of a settlement upon judicial modification of what it perceives to be an "unfair" negotiated labor settlement when those labor grounds are unrelated to the substantive provisions of the Bankruptcy Code. The bankruptcy court admitted as much in its cover letter transmitting the Nunc Pro Tunc Order:

> You have argued that this Court cannot impose a settlement on parties with respect to the labor dispute. The Court recognizes that ordinarily that is true.

ity as an interest arbitrator, the settlement also resembles an interest arbitration award in some respects. Inasmuch as there is no record of the unresolved issues, we are inclined to view the strike settlement as a unique agreement that does not fall into any particularized category. In any event, we need not resolve the issue of how to characterize the settlement in the light of the agreement of all of the parties to these appeals that it is an enforceable contract, the interpretation of which is reviewed de novo.

7. Pursuant to 11 U.S.C. §§ 1107 and 1108, Continental, as a debtor in possession, has substantially the same power as a trustee under the Bankruptcy Code.

I think this was a very special circumstance which was submitted to Judge Roberts for determination somewhat as if he were an arbitrator and this Court was thereafter requested to hear any objections to the Amended Order and Award determined by Judge Roberts. Therefore, it seems to me that the parties have requested this Court to enter an order and settlement of the dispute. Judge Roberts is no longer available to make changes in his order. Therefore, it is up to me to make changes where appropriate and necessary.

We conclude that the bankruptcy court did not have the authority, under Rule 9019(a), to condition its approval of the negotiated settlement upon modifications to the lawful labor provisions thereof that have no bearing on the court's duties to preserve the estate and to protect its creditors.

### B

■ The O'Neill Group contends, however, that the bankruptcy court's equitable powers are sufficiently broad to permit the court to consider the interests of the employees with respect to labor matters in connection with its decision to approve or disapprove the settlement. The O'Neill Group relies on *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984), which involved the rejection of a collective bargaining agreement pursuant to 11 U.S.C. § 365. The Supreme Court held that, although the bankruptcy court must consider the interests of employees in determining whether to approve the rejection of a collective bargaining agreement,

> the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering those equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equi-

ty, but rather only how the equities relate to the success of the reorganization. *Bildisco* does not support the O'Neill Group's argument under the circumstances of this case. The issue before the bankruptcy court was whether to approve a settlement negotiated by ALPA and Continental. The members of the O'Neill Group were represented by ALPA, their freely chosen collective bargaining representative, during those settlement negotiations. Thus, there was no special need for the bankruptcy court to intervene to protect this group from what it perceived to be an unfair labor settlement.[8]

Section 105(a) of the Bankruptcy Code states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Although this court has noted that "[e]quitable considerations should be preeminent in the exercise of bankruptcy jurisdiction," *AWECO*, 725 F.2d at 300, it has also pointed out that Section 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986). *See also Matter of Chicago, Milwaukee, St. Paul & Pac. R.*, 891 F.2d 159, 162 (7th Cir.1990). Moreover, there is a strong federal labor policy precluding judicial modifications of the substantive terms of labor agreements. *See, e.g., Chicago & N.W.R. v. United Transp. Union*, 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 1736 n. 11, 29 L.Ed.2d 187 (1971); *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). We cannot agree with the O'Neill Group that Congress intended for the broad equitable powers of the bankruptcy court to be exercised in a manner that would undermine that longstanding and important federal labor policy. Had Continental not been in bankruptcy at the time of the strike

---

**8.** Subsequent to the settlement, many of the striking pilots pursued a separate lawsuit alleging breach by ALPA of its duty of fair representation in negotiating and agreeing to the terms of the settlement. *O'Neill v. ALPA*, 886 F.2d 1438 (5th Cir.1989). This court reversed the district court's grant of summary judgment in favor of ALPA in that litigation. The O'Neill Group also filed a lawsuit against Continental alleging that the settlement violates the Railway Labor Act. *O'Neill, et al. v. Continental Airlines, Inc.*, No. 87–259 (S.D.Tex., Lake, J.).

settlement, a federal court would have had no authority to modify the back-to-work agreement between ALPA and Continental, or to impose conditions that were not agreed to by the parties. Where the parties in interest negotiate a mutually acceptable labor agreement that has no adverse impact on creditors, which is the case here, the bankruptcy court has no greater authority to modify the labor portions of the settlement than any federal court would otherwise have. We therefore conclude that Section 105 of the Bankruptcy Code does not authorize the bankruptcy court to change the terms of a labor settlement agreement negotiated by a union on behalf of its members, or to require acceptance of certain terms which do not enhance the success of the reorganization as the price for gaining the bankruptcy court's approval of the bankruptcy portions of the settlement.

### C

■ We also hold that the bankruptcy court did not acquire authority to change the settlement by virtue of the parties' designation of Judge Roberts as interest arbitrator on October 30, 1985. The bankruptcy court's cover letter transmitting the Nunc Pro Tunc Order indicates that the court apparently understood that designation to be the basis for its authority to impose changes. The bankruptcy court repeated that understanding of its role in its Terms of Order Denying Stay, stating that Continental and ALPA had "invited this Court to set the terms of the settlement."

The bankruptcy court's characterizations of its authority are not supported by the record. On October 30, 1985, ALPA and Continental designated Judge Roberts as an interest arbitrator to resolve the issues outstanding on that date. In the light of Judge Roberts' familiarity with the many difficult issues, his familiarity with the positions and sensitivities of the parties, his familiarity with the compromises already reached during the negotiations, and the parties' general familiarity with Judge Roberts' approach to the case, it is apparent that Judge Roberts was designated by

ALPA and Continental to act as an interest arbitrator only in his *individual* capacity, separate and distinct from his role as a bankruptcy judge. The transcript of the October 31, 1985 hearing supports that conclusion:

> MR. GALLAGHER: Yes, Your Honor, we would simply like to clarify for the record that Your Honor referenced yesterday's proceeding under the equitable power of the Court, and, indeed, we acknowledge that we are proceeding under those auspices. In addition to that, however, Your Honor, the parties want to make clear for the record that by mutual agreement to the procedures that we are involved in now, *the parties have, in effect designated Your Honor as an interest arbitrator, with all of the power of an arbitrator, independent of Your Honor's judicial powers, and the inherent equitable powers of this Court.* Since we believe that we have, through our procedural agreement in this process, invoked an interest arbitration-like situation, we wanted to make it clear in nature of the procedure and the nature of our perception of the authorities, by which Your Honor was proceeding.

Transcript of October 31, 1985 at pp. 1–2 (emphasis added).

The Order Relative to Claims, Controversies and Related Litigation also acknowledges the authority granted to Judge Roberts:

> Continental and ALPA have consented to have this court resolve all outstanding issues submitted to this Court.
>
> After considering all matters and issues before the Court as between Continental and ALPA, this Court, in the exercise of its equitable powers pursuant to Section 105 of the Bankruptcy Code, and as an interest arbitrator pursuant to the agreement and consent of ALPA and Continental, hereby makes its following findings and orders: ....

■ A consensual grant of authority to an interest arbitrator acts in derogation of a party's freedom of contract, and such a grant must be construed narrowly to avoid exceeding the consent granted. *AT*

& T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The authority of an arbitrator, including an interest arbitrator, generally expires with the issuance of his award. *Devine v. White,* 697 F.2d 421, 433 (D.C.Cir.1983).

The record is clear that Judge Roberts' role as an interest arbitrator was limited to the unresolved issues as of October 30, 1985. Moreover, neither party gave, even to Judge Roberts, plenary authority "to make changes where appropriate and necessary," as the bankruptcy court later assumed. We therefore conclude that the interest arbitration proceeding ended when Judge Roberts issued the Amended Order and Award on November 19, 1985. Although the bankruptcy court apparently construed Continental's motion to approve the settlement as a reopening of the interest arbitration, Continental's motion, and the notice of hearing sent to all creditors, cited only Continental's request for approval of the settlement pursuant to Bankruptcy Rule 9019(a). Thus, there is no justification for the bankruptcy court's assumption that because Judge Roberts had been authorized to act as an interest arbitrator, that same authority was conferred on the bankruptcy court through the motion to approve. Because the authority conferred on Judge Roberts was limited in scope, was conferred on him personally, and expired upon the issuance of the Amended Order and Award, the bankruptcy court had no authority as a "successor interest arbitrator."

### D

We therefore conclude that the bankruptcy court's source of authority with respect to the labor provisions of the settlement that are at issue in these appeals stems from the settlement itself which, as we have noted, provides that the bankruptcy court will retain jurisdiction to enforce its terms.

### IV

Although Continental and ALPA expressly agreed in the settlement that the bankruptcy court would retain jurisdiction to interpret and enforce the settlement, they did not authorize the bankruptcy court to modify its terms or to impose new terms upon the parties in the absence of their consent. We therefore will consider the issues before us in the context of whether the bankruptcy court exceeded the powers of interpretation and enforcement expressly granted to that court by the parties in their strike settlement agreement.

An agreement between parties subject to the Railway Labor Act is a federal contract governed by federal law. *Andrews v. Louisville & Nashville R.R.,* 406 U.S. 320, 323, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972). To the extent an interpretation of an agreement depends upon extrinsic evidence that interpretation is a finding of fact; otherwise, it is a conclusion of law. *North Shore Laboratories Corp. v. Cohen,* 721 F.2d 514 (5th Cir.1983). Interpretations of a settlement agreement are also subject to de novo review. *See Jeff D., et al. v. Andrus,* 899 F.2d 753 (9th Cir.1990). When interpreting a settlement agreement a court should not read individual sections out of context to achieve a result not originally contemplated by the parties. *Id.; see also Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.,* 713 F.2d 319, 322 (7th Cir.1983). The bankruptcy court's findings of fact are reviewed under the "clearly erroneous" standard; its conclusions of law are subject to de novo review. *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1252 (5th Cir.1986); Bankruptcy Rule 8013.

We now consider whether the Nunc Pro Tunc Order and the January Orders can be upheld as interpretations of the settlement. Continental argues that the district court properly vacated the Nunc Pro Tunc Order because the Nunc Pro Tunc Order changed the settlement in five ways, the first three of which are also the subjects of the three January Orders:

(1) it created reinstatement rights under the settlement for pilots who had "involun-

tarily" resigned or retired during the strike;

(2) it ordered Continental to "fence off" "foreign" pilots of acquired airlines from flying existing Continental routes and planes until Continental restored full, uncurtailed seniority bidding rights to returning strikers;

(3) it provided that fourteen pilots who had been awarded captain vacancies in a pre-settlement system vacancy bid, but who had not yet been recalled at the time of the settlement, were classified as neither working pilots nor returning strikers and were entitled to immediate recall;

(4) it required Continental to dismiss litigation against individual pilots, without regard to the eligibility of such pilots for one of the settlement options; and

(5) it allowed Option 3 pilots to change their option selection to Option 1, and created a new Option 1A for those Option 3 pilots and resigned or retired pilots who elected to obtain the benefits of an Option 1 pilot.

### A

■ We first consider the bankruptcy court's rulings with respect to pilots who resigned or retired during the strike.[9]

The settlement explicitly excludes resigned and retired pilots from eligibility for the settlement options:

All pilots on the July 31, 1983 seniority list who are not currently active or on authorized leave and who have not *resigned, retired*, or been terminated for cause ... shall be eligible to elect recall and reinstatement.... (emphasis added)

As we have already noted, the bankruptcy court initially approved the settlement over the O'Neill Group's objections that the settlement unfairly excluded resigned and retired pilots from the settlement options.

In the Nunc Pro Tunc Order, however, the bankruptcy court ruled that pilots who resigned or retired in order to obtain the distribution of funds in their pension plan

"were in all probability, effectively economically coerced from the property intentionally or otherwise," and were entitled to recall rights under the settlement. Contrary to their earlier objection to the settlement on the ground that it excluded resigned and retired pilots, the O'Neill Group now takes the position that the Nunc Pro Tunc Order properly "interprets" the settlement. We cannot agree. The Nunc Pro Tunc Order clearly changes the settlement, and the bankruptcy court admitted as much in its cover letter transmitting the Nunc Pro Tunc Order to counsel:

[I] have included "resigned or retired" pilots within the recall rights of the [settlement]. You have argued that this Court cannot impose a settlement on parties with respect to the labor dispute. The Court recognizes that ordinarily this is true.... [I]t seems to me that the parties have requested the Court to enter an order and settlement of this dispute. Judge Roberts is no longer available to make changes in his order. Therefore, it is up to me to make changes where appropriate and necessary.

The bankruptcy court candidly described its intentions in the Nunc Pro Tunc Order as an effort to "rectify" an "unfair labor practice" "whether ... intended or unintended." Thus, the bankruptcy court sought to create a right to settlement benefits for resigned or retired pilots notwithstanding their exclusion according to the settlement's express terms. In so doing, it exceeded its authority to interpret and enforce the settlement.

The January Order on Resigned and Retired Pilots restricted the settlement's exclusion of resigned and retired pilots to those pilots who "voluntarily" resigned or retired: "Any pilot who was coerced into resigning or retiring as a result of actions by Continental Airlines ... shall be, and are, eligible to participate in the three options provided for in the Amended Order

---

9. During the period beginning with Continental's petition in bankruptcy court on September 23, 1983 and the Order Approving Settlement on December 27, 1985, approximately 250 pilots resigned from Continental, many allegedly to receive their retirement benefits.

and Award."[10] Thus, the Order on Resigned and Retired Pilots differs from the Nunc Pro Tunc Order in that it makes pilots who resigned or retired "involuntarily" eligible for all settlement options, whereas the Nunc Pro Tunc Order had made them eligible for only the recall options.

The bankruptcy court's denomination of the Order on Resigned and Retired Pilots as an "interpretation" does not change the fact that the bankruptcy court's grant of rights to resigned and retired pilots constitutes a material change from the terms of the settlement, which expressly excludes all resigned and retired pilots from eligibility to select the settlement options.

We therefore hold that the district court correctly vacated the Nunc Pro Tunc Order insofar as it created recall rights for resigned and retired pilots, and we reverse the district court's order reinstating and affirming the bankruptcy court's January Order on Resigned and Retired Pilots.[11]

### B

We now consider the bankruptcy court's rulings with respect to the merger of Continental and New York Air and the integration of "foreign" pilots into Continental's seniority list.

The dispute at issue arose in the following manner. On August 28, 1986, Continental published two alternative system vacancy bids: 1986–1A and 1986–1B. These alternative bids were published to accommodate Continental's plans to merge Continental with New York Air and to merge the pilot workforces of the two airlines. In anticipation of this merger, Continental integrated the Continental and New York Air pilot seniority lists.

System vacancy bid 1986–1A was to create eighty-four new captain positions. Working pilots and returning strikers were requested to submit bids and preferences for these positions and for the secondary positions that would result from the bidding process. The 1986–1A bid was to be effective only if Continental chose not to merge the two airlines.

System vacancy bid 1986–1B was to create seventy-nine new captain positions within the combined Continental–New York Air system. Continental allowed all working pilots, those returning strikers who had been recalled prior to that date, and 323 New York Air pilots on the integrated pilot seniority list to submit bids for bases and equipment within the combined system. This combined system included both Continental and New York Air aircraft and both Continental and New York Air bases. The 1986–1A and 1986–1B bids closed on September 16, 1986.

Continental utilized a "flat filing system" to award bids to pilots based on their seniority. Continental exercised its discretionary assignment rights as provided in the settlement to assign the returning strikers eligible for captain positions to their initial base and equipment. As a result of this process, twenty New York Air pilots were awarded positions at the tradi-

---

**10.** The O'Neill Group contends that this court does not have jurisdiction of the appeal from the district court's affirmance of the bankruptcy court's January Order on Resigned and Retired Pilots because the bankruptcy court's order was not a final order. We disagree. Even though the bankruptcy court has not held any hearings to determine whether individual pilots were coerced into retiring or resigning in order to obtain their pension funds, the bankruptcy court has conclusively determined that the settlement should be interpreted as excluding only those pilots who "voluntarily" resigned or retired. That decision in effect grants declaratory relief and is thus a final decision that we have jurisdiction to review.

**11.** We believe that the procedure initially suggested by Continental in response to the objec-

tions made by the resigned and retired pilots prior to the bankruptcy court's initial approval of the settlement, with which the bankruptcy court apparently agreed at the time, is the most appropriate method for dealing with this issue. Continental suggested that any resigned or retired pilot was free to challenge, in an appropriate forum, the legal validity of his retirement or resignation and then, if successful (i.e., if "unretired" by court order), such pilots could seek to participate in the settlement, and could use the dispute resolution mechanism included in the settlement to obtain relief from the bankruptcy court, if necessary. Nothing in our opinion should be interpreted as precluding such a course of action.

tional Continental bases of Houston, Denver, and Honolulu; thirty-one returning strikers were assigned to New York Air bases, and seventy-one returning strikers were assigned captain positions on different bases or equipment from those they would have received under bid 1986–1A.

On October 3, 1986, the bankruptcy court held an evidentiary hearing on the O'Neill Group's motion to compel compliance with the settlement. The O'Neill Group sought to prevent Continental's unrestricted integration of foreign pilots into the Continental pilot bid system. At that time, the court ruled that "New York Air pilots should not participate in the bid to the prejudice of Option Three pilots before all Option Three pilots are recalled." On November 25–26, 1986, the court held additional hearings on Continental's proposed use of foreign pilots. On December 29–31, 1986, the bankruptcy court held an evidentiary hearing on ALPA's motion to determine the full effect of allowing foreign pilots to bid against returning strikers. ALPA and the O'Neill Group argue that the evidence from those hearings showed that: (1) foreign pilots were able to obtain much better, more desirable base and equipment assignments than more senior returning strikers; (2) foreign pilots could not be bumped by former strikers after the restoration of the former strikers' full bidding rights and thus each foreign pilot was able to retain the particular desirable base and equipment assignment until such time as he voluntarily vacated it; (3) Continental's rationale for initially obtaining and then enforcing its discretionary right to assign returning strikers, supposedly to prevent the crippling of a Continental base, had no basis in fact; and (4) this rationale was merely a pretext to discriminate against former strikers by assigning them to distant bases and less desirable equipment. Following that hearing, Judge Wheless ruled that the awarding of pilot vacancies from an integrated bid list violated the settlement.

In the Nunc Pro Tunc Order, the bankruptcy court held that the settlement "would be violated by Continental if it allows ... [foreign pilots to participate in system bids or accept assignment under pending bids] while at the same time denying [former striking pilots] their full right of seniority...." The bankruptcy court held that "Continental shall not integrate any pilot from another airline ... so as to allow such pilot to be able to participate in any future bid or accept assignment under any pending Bid Award in preference to any Continental pilot on the July 31, 1983 seniority list," and ordered Continental to "fence off" foreign pilots from flying existing Continental routes and planes unless Continental restored full, uncurtailed seniority bidding rights to returning strikers. The bankruptcy court thus found that Continental's discretionary right to assign pilots to their initial base and equipment as captains did not apply in the context of a merged pilot work force. The bankruptcy court also ruled that the integration of pilots from other airlines unfairly "affects and diminishes" the rights of the former striking pilots.

In the January Order Prohibiting Integration, the bankruptcy court again interpreted the settlement to forbid Continental from fully integrating pilots of acquired airlines into its bid system until all former striking pilots had regained plenary use of their seniority status. The January Order further provided that pilots of acquired airlines "may fly the airplanes and routes from bases of the acquired or merged airlines, but are to be fenced off Continental's seniority list until all of the pilots on Continental's seniority list just prior to their strike return or until their right to return is expired."

We note at the outset that there is no contention that the integrated bid list deprived returning strikers of jobs. In the settlement, Continental guaranteed that 185 returning strikers would be awarded captain positions by December 31, 1988. In its brief, Continental states that over 320 returning strikers had been awarded captain vacancies by that date, and its statement is not disputed by any party to these appeals. Rather, ALPA's contention is only that the integrated bid list deprived returning strikers of an initial choice of

location and equipment upon their return as captains.

■ All of the parties agree that the settlement neither explicitly allows nor precludes Continental from merging with and/or acquiring other airlines, integrating the seniority lists of those other airlines with its own, or continuing to exercise its discretionary assignment rights after a merger. When an agreement is ostensibly silent on a matter, the supervising court is charged with construing the four corners of the agreement in the light of the surrounding circumstances to determine the parties' intent. *North Shore Laboratories Corp. v. Cohen,* 721 F.2d 514, 518–19 (5th Cir.1983). The only language in the settlement that could possibly be interpreted as relating to expansion by merger is the definition of "vacancy," which the settlement defines as "any unstaffed pilot position which results from system wide expansion or attrition." Thus, the parties at the very least envisioned a situation in which Continental would continue to expand from the system that existed during bankruptcy.

■ The settlement is directed to and specifically discusses only working pilots and returning strikers. The settlement attempts to satisfy each competing group of pilots by providing an order of recall for the returning strikers, by providing certain assurances as to future vacancies at Continental, particularly for captain positions, and by providing for certain, limited restrictions on the exercise of seniority rights by the former strikers.

The settlement provides that "[a]ll future vacancies will be made available to eligible working pilots and returning strikers in accord with the provisions of this paragraph 2." A "vacancy" is defined as "any unstaffed pilot position which results from system wide expansion or attrition." With respect to filling of vacancies, the settlement provides that "[e]xcept as provided in subparagraphs (b) and (c) below, striking pilots who are reinstated will thereafter bid with working pilots ... for all new vacan-

cies." Subparagraph (b) is captioned "Initial Assignments," and creates the right of assignment that is at issue here: [12] "The initial base and equipment of a returning striker shall be assigned by the Company; the base and equipment of a returned striker in his/her initial post-strike service as a Captain may also be assigned by the Company." Future captain vacancies were to be allocated between returning strikers and working pilots according to a procedure that called for the first 100 vacancies to go to working pilots, the next 70 to returning strikers, and thereafter returning strikers and working pilots were to be awarded captain vacancies on a 1:1 ratio.

ALPA does not seriously argue that the settlement agreement precludes a merged seniority list, or that the agreement precludes a senior foreign pilot from exercising seniority rights over the lesser seniority rights of a junior returning striker. Rather, ALPA's central contention is that Continental's exercise of its discretionary assignment rights in the context of a merged workforce discriminates against returning strikers in their initial assignments to captain vacancies, and that the settlement agreement thus precludes foreign pilots from occupying bases or equipment preferred by senior returning strikers. According to ALPA, the parties intended that the specific, limited restrictions on strikers' seniority rights were to exist in the context of a pilot workforce comprised of "working pilots" and "returning strikers" and only those pilots. The "working pilots" definition establishes a September 15, 1985 cutoff date for categorization purposes. ALPA points out that the earliest a "foreign pilot" could have been considered a Continental pilot was in the fall of 1985 and that, therefore, none of the foreign pilots now integrated into Continental's pilot system could possibly have been members of the "working pilot" class at the time of their bidding and integration. ALPA contends that if Continental had an intention to merge with or acquire other airlines, or

12. Continental advises in its brief that, beginning with the 1987–3 bid, posted and awarded in the fall of 1987, Continental has waived its as-

signment rights and that the issue thus will not recur.

wished to ensure that its discretionary assignment rights were applicable in such a scenario, it was incumbent upon it to express that desire in order to obviate any ambiguity. According to ALPA, the former striking pilots understood and appreciated the risk of losing a desirable base or equipment assignment to a Continental pilot (working pilot or another former striker), but they did not accept the risk of losing such favorable assignments to foreign pilots, and certainly not ones with less seniority.

ALPA's argument is unconvincing. We start with the proposition that each party entered into the settlement negotiations with certain rights. Unless such rights were restricted or eliminated by agreement, they remain intact after the settlement. Prior to the settlement, Continental had the right to merge with other airlines and to merge the pilots of such acquired airlines into its seniority list. Nothing in the settlement agreement restricts that right. Even if we assume that, before the settlement, returning strikers would have had a right to bid their seniority for their choice of base and equipment in their initial assignments as captains, any such right was clearly given up in the settlement agreement. ALPA attempts to vitiate that portion of the agreement simply because the occurence of an event that was reasonably foreseeable did not give the returning strikers as good a deal as they had hoped for. If ALPA had wished to insure itself against events such as acquisition or merger, or to limit its competition for jobs only to the present workforce at Continental, or wished the agreement to apply only to the static world as it existed, it was incumbent on ALPA to so condition the terms of the agreement. For whatever quid pro quo, in negotiations, ALPA gave up the opportunity for its returning members to use their seniority to determine their initial base and equipment as captains. Under the terms of the settlement, Continental is given the discretion to make those assignments, and nothing in the settlement limits or restricts its discretion in the event of a merger. Therefore, since the returning strikers had no right of choice at all, the merged seniority list could not have impaired the settlement agreement in this respect.

To the extent that ALPA argues that the merged seniority list unfairly restricted returning strikers' rights to bid on new vacancies after their initial return, their argument assumes that the agreement precluded indefinitely, perhaps for years, any merged seniority list of any kind. No plausible argument can be made that the settlement agreement, which made no reference to mergers or merged seniority lists, had such a broad sweep as to vitiate the otherwise inherent rights of Continental.

Finally, we should observe that the only prejudice to returning strikers from "foreign" pilots is that some locations and equipment that might otherwise have been available to returning strikers are occupied by foreign pilots. That prejudice, however, results not from the merger, but from the settlement agreement itself, in which ALPA specifically waived any rights that returning strikers may have otherwise had to exercise their seniority to choose the base and equipment in their initial captain assignments. In all other respects, a merged seniority list does not prejudice the seniority rights of any returning strikers, because they enjoy rights identical to working pilots with the same seniority on any merged list. The merged seniority list does not take away any jobs, deny any opportunity to return to work, or infringe upon any seniority rights of returning strikers in all subsequent assignments.

We therefore affirm the district court's order vacating the Nunc Pro Tunc Order's ruling on this issue, and we reverse the district court's order reinstating and affirming the bankruptcy court's January Order Prohibiting Integration of Foreign Pilots.

### C

We now consider the bankruptcy court's treatment of the "Group of 14," composed of fourteen pilots who had placed their names on the recall list prior to the settlement, and had been awarded captain positions on the pre-settlement 85-5 vacan-

cy bid, but had not been recalled at the time of the settlement.[13]

In the Nunc Pro Tunc Order, the bankruptcy court held that these fourteen pilots were entitled to be recalled to the positions they were awarded under the pre-settlement vacancy bid rather than to the positions they would receive as recalled strikers under Option 1 or Option 3. The bankruptcy court further held that these bid awards were exempt from the 1:1 ratio for allocation of captain vacancies between returning strikers and working pilots. The relief granted by the bankruptcy court in the January Order on Group of 14 was identical, with the exception of the exemption from the 1:1 ratio.

The bankruptcy court relied on Sections I.B.1. and I.B.2(c)(i) of the settlement. Section I.B.1. ("Right to Reinstatement") states:

> All pilots on the July 31, 1983 seniority list who are not currently active or on authorized leave and who have not resigned, retired, or been terminated for cause ... shall be eligible to elect recall and reinstatement in accord with the procedures set forth herein. All such pilots who elect recall and resolution of their claims against Continental ... as provided in Section III.B.1. ... shall be placed on a new preferential recall list in seniority order, and shall be treated for purposes of this Order and Award as having made an offer to return to work as of September 15, 1985. Such a pilot who elects recall but does not wish to resolve his/her claims in said manner shall be placed on the recall list and recalled subsequent to the recall of waiving pilots in the order in which his/her unconditional offer to return to work was received by Continental.

Section I.B.2(c)(i) states:

> *All pilots awarded positions on Vacancy Bid 1985–5 shall receive the position awarded,* subject only to delay to a

date necessary to accommodate the return of striking pilots in accord with the provisions of this paragraph (c). The Company may reallocate the awarded vacancies on that bid to different equipment within status where necessary to accommodate changes in the projected fleet, provided that the total number of awarded vacancies by status shall not be increased by such an adjustment. [Emphasis added.]

Continental contends that none of the provisions establishing the recall and vacancy allotment procedures applicable to returning pilots makes any exception for any subgroup of pilots. It also points out that the settlement expressly includes pilots on the preferential recall list within its definition of "returning strikers":

> For purposes of this Order and Award, "returning striker" means a pilot on strike as of September 15 (including those then on the preferential recall list) who elects recall pursuant to the terms of this Order and Award; ....

Amended Order and Award, Section I.B. 2.(c)(vii). Continental argues that the intention of the parties is clear that the recall and future job rights of the pilots on the pre-settlement preferential recall list were to be determined in the same manner as all other returning pilots under the settlement, i.e., according to their option election. According to Continental, the reference to "all pilots" in Section I.B.2(c)(i) cannot be interpreted as the bankruptcy court did in its January Order because the purpose of that paragraph was only to make clear that *working pilots* awarded positions on the 1985–5 vacancy bid would receive the positions so awarded, but that actual entry into those positions might be delayed to accommodate returning strikers in accordance with the timetables set forth in the settlement.

---

**13.** In its brief, Continental advised us that, subsequent to the Nunc Pro Tunc Order and the Order on Group of 14, Continental reached private settlements with seven of the eight members of this group who returned to work; three others were recalled to work by Continental, but were deleted from the seniority list when they failed to report for training; and the final three members of this group elected Option 2 and received the severance pay to which they were entitled.

We disagree with Continental's interpretation of Section I.B.2(c)(i). Although it is clear that these fourteen pilots are "returning strikers" as defined in the settlement, Section I.B.2(c)(i) clearly provides that *all* pilots, rather than working pilots only, are to receive the positions awarded in Vacancy Bid 85–5. Because these fourteen pilots are defined in the settlement as "returning strikers," however, they are not exempt from the 1:1 allocation of captain vacancies, the requirement that pilots on strike for more than twenty-four months serve for a period as first officers, or other requirements generally applicable to returning strikers.

Because the bankruptcy court exceeded its authority to interpret the settlement by its ruling on these pilots in the Nunc Pro Tunc Order, we affirm the district court's April 7, 1989 order vacating the bankruptcy court's ruling. The January Order on Group of 14, however, properly interprets the settlement. We therefore affirm the district court's March 13, 1989 order reinstating and affirming the Order on Group of 14.

### D

We now consider the Nunc Pro Tunc Order's requirement that Continental dismiss RICO claims against certain individual pilots.[14]

On October 12, 1983, Continental filed suit against ALPA in bankruptcy court alleging violations of the Railway Labor Act and the Sherman Anti–Trust Act. Continental amended its complaint on January 30, 1984 to include claims against ALPA and eight individual pilots for alleged violations of the Racketeer Influenced and Cor-

rupt Organizations Act of 1970, 18 U.S.C. § 1961, *et seq.*

In the third section of the settlement, Continental and ALPA agreed to dismiss "all litigation pending" between the two. In addition, Continental agreed to "dismiss its claims against each individual pilot defendant in such litigation who elects an option under this [Amended] Order and Award which includes resolution of all of his claims against Continental" in accordance with Option 1 or Option 2. Continental refused to dismiss the RICO claims against four defendant pilots [15] who were ineligible [16] for Options 1 or 2 (the settlement options providing for waiver of striking pilots' claims against Continental), taking the position that the settlement did not require dismissal with respect to pilots ineligible to choose either Option 1 or Option 2.

In the Nunc Pro Tunc Order, the bankruptcy court ruled that Continental was required to dismiss any cause of action pending against a pilot who was willing to discontinue his/her claims against Continental, regardless of whether such a pilot was eligible to elect Option 1 or Option 2 under the settlement. The Order further permitted ALPA to withhold compliance with the settlement until all appeals of the Nunc Pro Tunc Order have concluded.

ALPA contends that Continental's refusal to dismiss the RICO action violated the settlement, that the ruling in the Nunc Pro Tunc Order was a proper interpretation of the settlement, and that the district court therefore erred in vacating the Nunc Pro Tunc Order in this respect. ALPA argues that the intent of the language in the settlement is not to make dismissal of the RICO actions contingent upon a pilot's abil-

---

14. This issue is relevant only to those few pilots who were named as individual defendants, along with ALPA, in Continental's 1984 lawsuit alleging RICO violations, and who were ineligible to elect an option under the settlement. The RICO lawsuit alleged that ALPA and the individual defendants had engaged in a pattern of violent acts against Continental and working pilots (including the possession of pipe bombs with which to attack the homes of working pilots for which two of the named defendants received felony convictions).

15. ALPA's brief informs us that Continental subsequently dismissed all of its claims against one of these four pilots, but that the other three pilots remain defendants in the RICO action.

16. Pilots who were ineligible to elect Options 1 or 2 under the settlement included those who had resigned, retired, or been terminated for cause.

ity to elect a particular option, but rather to make dismissal contingent upon the pilots' corresponding waiver of claims against Continental.

ALPA's argument overlooks the express language of the settlement, which unambiguously states that Continental is to "dismiss its claims against each individual defendant in such litigation who elects an option under this [settlement] which includes resolution of all of his claims against Continental." If the parties had intended for that provision to have the meaning that ALPA advances, they easily could have worded the provision in a manner that would effectuate that intent. For example, they could have stated that "Continental is to dismiss any cause of action pending against a pilot who agrees to discontinue his/her claims against Continental." Instead, the settlement's requirement that Continental dismiss litigation against individual pilots does not apply to certain categories of pilots: i.e., those who elected to retain their claims against Continental (Option 3 pilots), and those who were ineligible to elect any option under the terms of the settlement (i.e., pilots who were terminated for cause or who had resigned or retired).

We therefore affirm the district court's order vacating the Nunc Pro Tunc Order's ruling on this issue.

E

The settlement provided eligible striking pilots with three options. Each eligible pilot was sent a "Notice of Options" and had twenty-one days after receipt of the notice to elect an option. That election period ended prior to the December 1985 hearing. It is thus clear, and no party seriously contends otherwise, that the Nunc Pro Tunc Order changed the settlement by allowing Option 3 pilots to change their option selection to Option 1, and by creating a new Option 1A for those Option 3 pilots and resigned or retired pilots who also sought to obtain the benefits of an Option 1 pilot. We therefore affirm the district court's order vacating the Nunc

Pro Tunc Order's ruling with respect to this issue.

V

In the Nunc Pro Tunc Order, the bankruptcy court interpreted the settlement to provide that Option 1 pilots would advance to captain positions ahead of Option 3 pilots. ALPA, contending that the bankruptcy court's interpretation was erroneous, cross-appealed this portion of the Nunc Pro Tunc Order to the district court. Although the district court vacated the bankruptcy court's ruling on this issue, it did not directly address ALPA's cross-appeal. Continental has not appealed the district court's order insofar as it vacated the Nunc Pro Tunc Order's ruling on this issue. ALPA, however, cross-appeals the district court's order vacating the Nunc Pro Tunc Order to the extent that the district court failed to address ALPA's cross-appeal.

Apparently, ALPA seeks to have us rule on the issue now to preclude the bankruptcy court from reinstating its earlier interpretation. We decline to do so because this issue is not properly before us. The district court vacated the portion of the Nunc Pro Tunc Order that ALPA complained of in its cross-appeal. ALPA therefore received all of the relief that it sought in its cross-appeal to the district court, and it cannot appeal from the district court's decision in its favor on this issue. *E.g., In re First Colonial Corp. of America,* 693 F.2d 447, 449–50 n. 5 (5th Cir.1982), *cert. denied,* 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983). We therefore express no opinion with regard to the bankruptcy court's interpretation.

VI

We next consider the rulings of the district court and the bankruptcy court with respect to the deadline for pilots to accept recall.

The settlement provided that pilots would "retain their right to reinstatement until December 31, 1988," but pilots not reinstated by that date would be removed from the seniority list and have no further rights under the settlement. In the Nunc

Pro Tunc Order the bankruptcy court extended the recall acceptance deadline for Option 3 pilots, concluding that the extension was necessary to preserve the status quo. The district court did not rule on Continental's appeal of the Nunc Pro Tunc order until April 7, 1989, after the original deadline of December 31, 1988 had already expired. Although the district court vacated the Nunc Pro Tunc Order in every other respect, it affirmed the Nunc Pro Tunc Order's extension of the recall acceptance deadline for Option 3 pilots, and further provided that "the deadline for Pilots to accept recall is extended until the exhaustion of all appellate and remand proceedings relating to the Bankruptcy Court's Order [Approving Settlement]."

ALPA and the O'Neill Group concede that the extension of the recall acceptance deadline is a modification of the terms of the settlement, but they contend that the change is not material and is necessary for fairness. We disagree. In the settlement, Continental and ALPA agreed that Continental had the right to remove non-responding strikers from the recall list. By extending the time in which strikers must decide whether to accept Continental's offers of reinstatement, the bankruptcy court and the district court deprived Continental of that right. Because neither the bankruptcy court nor the district court had any authority to change the terms of the settlement, we hold that the courts below erred in extending the recall acceptance deadline.[17]

## VII

Finally, we consider whether the bankruptcy court's Order Approving Settlement is subject to modification. The Order Approving Settlement is, of course, to be distinguished in several respects from the settlement, which we have been discussing. The most important distinction for our purposes here is that the source of the bankruptcy court's authority with respect to the Order Approving Settlement is Bankruptcy Rule 9019(a). A bankruptcy court's decision to approve or disapprove a settlement is reviewed under an abuse of discretion standard. *In re AWECO, Inc.*, 725 F.2d 293, 297 (5th Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984). Thus, the question now is not a matter of interpretation, because the bankruptcy court is ordinarily free to modify its own non-final orders in the absence of intervening rights that may have vested in reliance on such orders. It is that question that we now consider.

Continental and the Working Pilots argue that the doctrine of intervening rights precludes modification of the Order Approving Settlement after Continental has implemented the settlement in reliance on the bankruptcy court's initial approval. Under the doctrine of intervening rights, a court's equitable power to set aside an order is limited to cases in which rights have not vested in reliance on that order.[18] A court may not avoid this limitation on its powers by characterizing its action as a nunc pro tunc order:

> All courts have the inherent power to enter orders nunc pro tunc to show that a thing was done at one time which ought to have been shown at that time. It is an entry now for something previously done so that the record may actually speak the truth. It may not be used for the purpose of wiping out a judgment previously entered by it affecting the rights of a party thereto.

---

**17.** Our ruling should not be interpreted, however, as precluding a later interpretation that the deadline established in the settlement is not intended to apply to any pilots who may later establish that they were entitled to recall rights under the original terms of the settlement, e.g., resigned or retired pilots who successfully contest the validity of their status and establish rights to recall under the dispute resolution mechanism of the settlement.

**18.** *See, e.g., Pfister v. Northern Illinois Finance Corp.,* 317 U.S. 144, 149, 63 S.Ct. 133, 137, 87 L.Ed. 146 (1942) (a petition for rehearing in a bankruptcy court may be granted only "before rights have vested on the faith of the action"); *Wayne United Gas Co. v. Owens–Illinois Glass Co.,* 300 U.S. 131, 137, 57 S.Ct. 382, 385, 81 L.Ed. 557 (1937) (bankruptcy court may grant rehearing "if no intervening rights will be prejudiced by its action").

*Matthies v. Railroad Retirement Bd.*, 341 F.2d 243, 248 (8th Cir.1965).[19]

■ Continental and the Working Pilots contend that the Nunc Pro Tunc Order's ruling with respect to "hardship" procedures improperly modified the Order Approving Settlement. Although the settlement contained no provisions for any "hardship" procedures, the Order Approving Settlement created a procedure under which pilots who alleged that the settlement operated unfairly as to them had thirty days to apply for "hardship" relief, which was to be evaluated on a case-by-case basis.[20] The Order, however, gave Continental sixty days to opt out of the settlement as to any pilots asking for hardship relief.[21]

Over a year later in the Nunc Pro Tunc Order, the bankruptcy court stated that, when it entered the Order Approving Settlement, it had not intended that Continental have a right to opt out of the settlement as to pilots claiming hardship unless the hardship claim would cause expenses Continental could not afford. The court also stated that it had not intended to permit Continental to opt out for purposes of the recall rights of the pilots. The court admitted that these restrictions had not been included in the earlier order: "Through mistake of the Court by way of omission from the express terms of the Court's Order [Approving Settlement] in expressing the true holding of the Court, these conditions were not expressed in the Order."

Although the district court vacated the Nunc Pro Tunc Order's provisions modifying the hardship procedures, the district court authorized the bankruptcy court to make further modifications of the Order Approving Settlement.

Continental contends that application of the doctrine of intervening rights is appropriate for the following reasons: (1) it did not object to the creation of the hardship procedure in reliance on the deadline established for filing hardship claims and on its right to opt out of the hardship claims procedure; (2) Continental, its creditors, and the bankruptcy court acted in reliance upon the settlement in approving Continental's plan of reorganization; (3) implementation of the severance option provided for in the settlement required an initial distribution prior to December 31, 1985, the deadline for Continental to opt out of the entire settlement pursuant to the Order Approving Settlement; (4) it has distributed over $1.7 million in severance payments; it has recalled, pay protected, and advanced over 300 pilots in accordance with the settlement; and it has forgiven litigation settled pursuant to the agreement with ALPA.[22]

The O'Neill Group contends that the motions to alter or amend kept the Order Approving Settlement from becoming a final order and that the doctrine of intervening rights is therefore inapplicable in this case. In support of its argument, the O'Neill Group cites *Wayne United Gas Co. v. Owens–Illinois Glass Co.*, 300 U.S. 131,

**19.** *See also Crosby v. Mills,* 413 F.2d 1273, 1277 (10th Cir.1969) (nunc pro tunc order may not supply order which in fact was not made and would affect rights of parties under original order).

**20.** Although the hardship relief procedure created by the bankruptcy court in the Order Approving Settlement indisputably changed the terms of the settlement, no party to the settlement objected to the change.

**21.** Timely hardship applications were filed by 128 pilots. Except for five pilots who asserted only factual disputes, Continental thereafter exercised its opt-out rights as to each such applicant.

**22.** In its brief, Continental informs us that, during the two years following the entry of the

Nunc Pro Tunc Order (and in accordance with the stay of the Nunc Pro Tunc Order issued by the district court on January 6, 1987), Continental has satisfied all of its settlement obligations; and that it has recalled and trained all Option 3 pilots who offered to return to work and for whom vacancies were available prior to December 31, 1988. Continental further states that, ultimately, 349 pilots returned to work pursuant to the settlement (261 under Option 1 and 88 under Option 3), and that Continental also provided one-half of all new captain vacancies to pilots returning under the settlement. According to Continental, by December 31, 1988, over 320 returning pilots had been advanced to or awarded captain vacancies, well beyond the 185 guaranteed by the settlement.

135, 57 S.Ct. 382, 384, 81 L.Ed. 557 (1937), in which the Court stated that a party proceeding "with full knowledge that a rehearing might be granted" is "not entitled ... to rely on any status acquired" in the interim. The O'Neill Group contends that Continental knew that the Order Approving Settlement was not final and that the O'Neill Group sought modification.

Although we agree that the motions to alter or amend rendered the Order Approving Settlement non-final for appeal purposes, the Order Approving Settlement nevertheless remained enforceable because it expressly directed the parties to proceed under its terms and the O'Neill Group did not seek a stay pending the resolution of the motions to alter or amend.[23] Continental was therefore obligated to implement the settlement under the terms of the Order Approving Settlement. Indeed, ALPA and the O'Neill Group were among those who filed motions with the bankruptcy court to compel Continental to comply with the terms of the settlement and the Order Approving Settlement. We also note that the motions to alter or amend were not filed until after the deadline for Continental to opt out of the entire settlement had expired and after Continental had already made severance payments.

The bankruptcy court's initial approval of the settlement was preceded by notice to all creditors and an opportunity for all creditors to object to the approval of the settlement. With the exception of the pilots involved in these appeals, none of Continental's other creditors objected to the settlement. On February 13, 1986, in the disclosure statement with respect to the Third Amended Joint Plan of Reorganization, creditors were advised of the motions to alter or amend. With the exceptions of the extension of the recall acceptance deadline and the elimination of Continental's right to opt out of the settlement as to hardship applications, none of the provisions of the Nunc Pro Tunc Order that are challenged in this appeal were proposed in the motions to alter or amend. On June 30, 1986, the bankruptcy court entered an or-

der confirming the debtors' third amended joint plan of reorganization. At oral argument, counsel for Continental contended that the reorganization plan was confirmed in reliance on the original Order Approving Settlement. He argued that the creditors' committees thereafter disbanded, and thus had no idea that, six months later, the bankruptcy court would enter orders that could impose operational and financial burdens that could have an adverse impact on Continental's creditors. There is no indication in the record that other creditors received any notice of the bankruptcy court's intention to set aside the Order Approving Settlement and of its intention to reapprove the settlement upon conditions that were not contemplated in the motions to alter or amend or in the disclosure statement. Moreover, the record does not reflect that the bankruptcy court considered the impact of its rulings in the Nunc Pro Tunc Order on the success of the reorganization.

We are persuaded that, because of the actions taken in reliance on the Order Approving Settlement, the district court correctly held that the bankruptcy court should not have set aside the Order Approving Settlement in order to interpret and enforce that Order or the settlement itself. For the same reasons, however, the district court erred in authorizing the bankruptcy court to make further modifications to the Order Approving Settlement. Although the bankruptcy court is, of course, free to interpret and enforce the Order Approving Settlement, any modification of that Order at this late date would be an abuse of discretion. The settlement, as originally approved by the bankruptcy court in the Order Approving Settlement, has been implemented during the four years since it was approved. Compelling interests of fairness and finality demand that the Order Approving Settlement be enforced according to its terms, without any modification.

### VIII

In conclusion, we hold that the Amended Order and Award is a valid, binding, en-

---

**23.** A court "may stay the execution of or any proceedings to enforce a judgment pending the disposition of a motion for a new trial or to alter or amend a judgment made pursuant to Rule 59." Fed.R.Civ.P. 62(b).

forceable settlement agreement. The bankruptcy court exceeded the power granted to it by the parties to interpret and enforce the settlement when, a year after the settlement was agreed upon and approved, it attempted to impose upon the parties its òwn notions of what, in retrospect, was a fair and equitable settlement of ALPA's strike against Continental.

We therefore affirm the district court's April 7, 1989 order to the extent that it vacated the bankruptcy court's Nunc Pro Tunc Order. We reverse the district court's April 7, 1989 order to the extent that it affirmed the bankruptcy court's extension of the recall acceptance deadline for Option 3 pilots, and to the extent that the district court further extended the recall acceptance deadline for all pilots. We also affirm the district court's order reinstating and reaffirming the bankruptcy court's January Order on Group of 14. We reverse the district court's orders reinstating and affirming the bankruptcy court's January Order on Resigned and Retired Pilots and the January Order Prohibiting Integration of Foreign Pilots.

AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.